2015-1684

# 𝔘nited 𝔖tates 𝔆ourt of 𝔄ppeals
# for the 𝔉ederal 𝔆ircuit

DSS TECHNOLOGY MANAGEMENT, INC.,

*Plaintiff-Appellant*,

v.

TAIWAN SEMICONDUCTOR MANUFACTURING COMPANY, LTD.,
TSMC NORTH AMERICA, SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC.,
SAMSUNG TELECOMMUNICATIONS AMERICA, LLC,
SAMSUNG SEMICONDUCTOR, INC., and
SAMSUNG AUSTIN SEMICONDUCTOR, L.L.C.,

*Defendants-Appellees*.

*Appeal from the United States District Court for the Eastern District of
Texas in case no. 2:14-CV-00199-JRG-RSP, Judge Roy Payne.*

## OPENING BRIEF FOR PLAINTIFF-APPELLANT
## DSS TECHNOLOGY MANAGEMENT, INC.

DEREK GILLILAND
NIX PATTERSON & ROACH, LLP
205 Linda Drive
Daingerfield, TX 75638
(903) 645-7333
dgilliland@nixlawfirm.com

EDWARD K. CHIN
CHRISTIAN JOHN HURT
NIX PATTERSON & ROACH, LLP
5215 N. O'Connor Boulevard
Suite 1900
Irving, TX 75039
(972) 831-1188
edchin@me.com
christianhurt@nixlawfirm.com

*Counsel for Appellant*

JULY 28, 2015



# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee, Christian Hurt, certifies the following:

1. The full name of every party or amicus represented by me is: DSS Technology Management, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: Document Security Systems, Inc. (trading symbol: DSS) owns 10% or more of Plaintiff's stock.

4. The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are: Nix Patterson & Roach, LLP; Derek Tod Gilliland; Andrew Joseph Wright (former); Christian J. Hurt; Edward K Chin; Kirk Austin Voss; Robert Winn Cutler; Ross Leonoudakis; The Davis Firm, P.C.; William Ellsworth Davis, III.

DATED: July 28, 2015.                    Respectfully submitted,


_____
CHRISTIAN HURT
*Attorney for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT...........................................................1

STATEMENT OF THE ISSUES ..............................................................1

STATEMENT OF THE CASE ..................................................................1

STATEMENT OF FACTS..........................................................................2

    I.     The Technology of the '084 Patent ........................................2

    II.    DSS's Litigation Against TSMC and Samsung........................7

    III.   The District Court's Claim Construction Opinion...............8

SUMMARY OF THE ARGUMENT.......................................................12

ARGUMENT ..........................................................................................15

    I.     Standard of Review..................................................................15

    II.    The District Court Improperly Limited The "Patterned Layer"
           to the Same Layer Material as The "Imaging Layer"........................14

             A.    The Plain Claim Language Does Not Restrict the
                    "Patterned Layer" to the Same Layer as The
                    "Imaging Layer"........................................................14

             B.    Dependent Claims Indicate That The "Patterned Layer"
                    Need Not Be The Same Layer Material as The "Imaging
                    Layer"........................................................................19

             C.    The Specification Does Not Limit a "Patterned Layer" to
                    The Layer Material of The "Imaging Layer" ...........21

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*800 Adept, Inc. v. Murex Sec. Ltd.*,
    539 F.3d 1354 (Fed. Cir. 2008).................................................................15

*Becton, Dickinson & Co. v. Tyco Healthcare Grp.*,
    616 F.3d 1249 (Fed. Cir. 2010)...........................................................16, 18

*Engle Indus., Inc. v. Lockformer Co.*,
    96 F.3d 1398 (Fed. Cir. 1996)...............................................................16

*Gaus v. Conair Corp.*,
    363 F.3d 1284 (Fed. Cir. 2004)..............................................................16

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
    750 F.3d 1304 (Fed. Cir. 2014)....................................................13, 21, 22

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014)..............................................................19

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004).....................................................13, 19, 22

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
    778 F.3d 1021 (Fed. Cir. 2015)..........................................................14, 21

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)...................................................20

*Powell v. Home Depot U.S.A., Inc.*,
    663 F.3d 1221 (Fed. Cir. 2012)..............................................................16

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
    663 F.3d 1221 (Fed. Cir. 2012)..............................................................16

*TomTom, Inc. v. Adolph*,
    --- F.3d ---, 2015 U.S. App. LEXIS 10328 (Fed. Cir. June 19, 2015) ..........23

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012).....................................................................21

### FEDERAL STATUTES AND RULES

28 U.S.C. § 1295 ............................................................................... 1, 12

28 U.S.C. §§ 1331 ...................................................................................1

28 U.S.C. §§ 1338 ...................................................................................1

## STATEMENT OF RELATED CASES

There are no other appeals in or from the same civil action or proceeding in the lower court or body currently pending or previously before this Court or another appellate court.

## JURISDICTIONAL STATEMENT

This case is a patent infringement action under Title 35 of the United States Code.  The District Court had exclusive subject matter jurisdiction based on 28 U.S.C. §§ 1331 and 1338(a).  The District Court entered a final judgment, and this Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

This appeal presents a single issue: Did the District Court correctly limit the "patterned layer" to the same layer material as the "imaging layer," even though the claims recite the "patterned layer" and "imaging layer" as separate "layer[s]," the Court's construction largely rendered duplicative two dependent claims, and the specification indicates that a layer "underlying" the "imaging layer" can be a layer "to be patterned"?

## STATEMENT OF THE CASE

Plaintiff-Appellant DSS challenges the District Court's Claim Construction Memorandum and Order ("Claim Construction Opinion"), J.A. 1–36, namely the Court's construction of the terms "first patterned layer having a first feature" and

"second patterned layer having a second feature" in United States Patent No. 5,652,084 ("the '084 Patent"), J.A. 6–13. The Claim Construction Opinion is available at *DSS Tech. Mgmt., Inc. v. Taiwan Semiconductor Mfg. Co.*, Case No. 2:14-CV-199-RSP, 2015 U.S. Dist. LEXIS 46177 (E.D. Tex. Apr. 9, 2015).

## STATEMENT OF THE FACTS

### I.    The Technology of the '084 Patent

The '084 Patent is directed to a method of manufacturing semiconductor devices (*e.g.*, microprocessors, memory, and similar devices) using a technique that increases the amount of circuit components that can fit on a particular semiconductor. Namely, the Patent is drawn to a method that reduces the distance between components through a specific lithography process that uses two light exposures through two patterns. Using the patented method, a semiconductor device can contain more components in a given space than is possible via a single-exposure process. The '084 Patent has a priority date of December, 1994 and expired in late 2014. Cypress Semiconductor Corp. developed and filed the '084 Patent, and DSS subsequently acquired the Patent.

The lithography process discussed in the '084 Patent is relatively straightforward. A conventional lithography process patterned the circuit components on a semiconductor device using a single-exposure to radiation through a mask. The first step in that process was to deposit, over a substrate, a

layer to be patterned. Then, over that layer to be patterned, the process deposits a layer of photoresist, a material sensitive to radiation exposure. J.A. 61, '084 Patent, col. 1:19–23. The process then exposes the photoresist layer to radiation through a mask, which "defines the pattern to be formed in the photoresist." *Id.* The exposure causes a chemical reaction that weakens the photoresist in accordance with the pattern of the mask. The process would then develop the photoresist resulting in "a patterned photoresist layer over the underlying layer to be patterned." *Id.* at col. 1:23–25. "[T]he pattern in the photoresist" is then "replicated in the underlying layer," *i.e.*, the "underlying layer" has the same pattern that was in the photoresist. *Id.* at col. 1:27–28. The Patent allows for multiple underlying layers. J.A. 62, '084 Patent, col. 3:16–19.

The above-described single-exposure processes, however, has an inherent limitation on the minimum size and distance between components, often referred to as the resolution limit. That limit is a function of the optical properties of the system and a manufacturing constant and is defined by an algebraic equation well-known to those in the art.

The method of the '084 Patent allows a manufacturer to break that limit and achieve finer spacing using conventional lithography processes. The Patent achieves this close spacing by using a double-patterning technique with two masks

so that the final pattern contains features of both masks and are closer than what the machine could be achieved with a single mask.

As disclosed in the embodiments in the specification, the process first deposits over a substrate (labeled 200) a layer to be patterned (labeled 210). The process then deposits an imaging layer, specifically a photoresist layer (labeled 220), and exposes that layer to radiation in accordance with a pattern in the mask.



J.A. 57, '084 Patent, Fig. 2.

The radiation process results in a pattern in the photoresist after development, which matches the pattern in the mask.



J.A. 57, '084 Patent, Fig. 3.

4

That photoresist pattern, using typical lithography processes, may be "replicated in the underlying layer." J.A. 61, '084 Patent, col. 1:27–28. Later in the process, the manufacturing method deposits a second imaging layer, which undergoes a second exposure and development. *Id.* at col. 1:47–56. Again, using conventional techniques, that second photoresist pattern could be replicated in an underlying layer. *Id.* The end of the process yields a pattern whose features (251, 232, and 253) are closer together than those features could be formed via a single-exposure process.



J.A. 53, Fig. 5.

That pattern may then be used "as a mask in patterning an underlying layer." J.A. 66, col. 12:48–53. The patterning of the layers creates the circuit components. As a result of the process, those components are packed closer together on the semiconductor device than a single-exposure process would allow.

The double-exposure process of the '084 Patent thus provides for higher circuit densities. That increased density is critical: the greater the number of components, the greater the processing power and the greater the memory storage.

For largely that reason, the semiconductor manufacturing industry labels each generation of processor based on a designation that correlates with the smallest feature or space between features. J.A. 533 (depicting expected technology roadmap from a resolution limit of 350 nm in 1995 to 70 nm in 2010). This case focuses on semiconductor devices made by processes labeled 28 nanometer-node processes.

The central issue in this appeal relates to the relationship between the "patterned layer" and "imaging layer" limitations in the '084 Patent claims. Specifically, the parties dispute whether the Patent excludes from the term "patterned layer" a layer below the "imaging layer" that contains the same exact pattern that was applied to the "imaging layer." Claim 1 is the only independent claim at issue.

> 1. A lithography method for semiconductor fabrication using a semiconductor wafer, comprising the steps of:
>
> (a) forming a first imaging layer over the semiconductor wafer;
>
> (b) patterning the first imaging layer in accordance with a first pattern to form a *first patterned layer having a first feature*;
>
> (c) stabilizing the first patterned layer;
>
> (d) forming a second imaging layer over the first pattern layer; and

(e) patterning the second imaging layer in accordance with a second pattern to form a *second patterned layer having a second feature* distinct from the first feature, wherein the second patterned layer and the first patterned layer form a single patterned layer, and wherein the first and second features which are formed relatively closer to one another than is possible through a single exposure to radiation.

J.A. 67, '084 Patent, claim 1 (emphases added). Dependent claims 4 and 5 further

refine each "patterned layer":

The method of claim 1, wherein the [patterning step (b) / patterning step (e)] includes the steps of:

(i) exposing a portion of the [first/second] imaging layer to radiation; and

(ii) developing the [first/second] imaging layer such that the exposed portion dissolves to form *the [first/second] patterned layer*.

J.A. 67, '084 Patent, claims 4 and 5 (emphasis added).

## II.    DSS's Litigation Against TSMC and Samsung

DSS brought suit against the TSMC and Samsung in March, 2014. DSS

alleged that TSMC's and Samsung's 28 nanometer node manufacturing processes

met the limitations of the '084 Patent claims. J.A. 38, 122–25, 128–132.

Examples of semiconductor devices made via TSMC's accused processes are the

Snapdragon 600 and 800 processors and the Cyclone V system-on-a-chip (SoC)

processors. J.A. 122–23, 132. An example of a semiconductor device made via

Samsung's accused processes is the Exynos 5140 processor. J.A. 124–25. In addition to manufacturing semiconductor devices, Samsung also provides smartphones and tablets that contain its processors and TSMC-manufactured processors, giving rise to additional infringement allegations. J.A. 132. For example, the Samsung Galaxy Note 3 includes the TSMC-made Snapdragon 800 processor. *Id.*

For both TSMC's and Samsung's accused manufacturing processes, DSS accused as each "patterned layer" a layer that underlies the identified "imaging layer." J.A. 39. Therefore, each identified "patterned layer" is not the layer material of the identified "imaging layer." J.A. 39.

The parties litigated the case through the *Markman* phase. In April, 2015, the District Court issued its Claim Construction Opinion, J.A., 1–36, construing the "patterned layer" terms in the Defendants' favor, J.A. 6–13. DSS then moved to stay the litigation to allow the parties to stipulate to a judgment of noninfringement based on the Claim Construction Opinion, J.A. 117. The District Court entered a Final Judgment on May 13, 2015, J.A. 47–48, and DSS filed its notice of appeal shortly thereafter, J.A. 120.

## III.    The District Court's Claim Construction Opinion

The District Court concluded that the "first patterned layer having a first feature" and "second patterned layer having a second feature" were limited to the

material from each respective "imaging layer" after the method exposed and developed that layer, *i.e.*, the same layer of material. J.A. 11–13. The Court declined to adopt DSS's position that the "pattern layer" could include a layer under the imaging layer that, through etching or other means, contained the same exact pattern (the same portions and spaces) as the imaging layer after exposure and development. J.A. 13.

Prior to the *Markman* hearing, the parties proposed the following constructions for the terms "first patterned layer having a first feature" and "second patterned layer having a second feature." J.A. 6–7, 944–47.

| DSS's Construction | Defendants' Construction |
|---|---|
| a layer containing the pattern defined by the portion of the first imaging layer that remains intact after the patterning step having a first feature<br><br>a layer containing the pattern defined by the portion of the second imaging layer that remains intact after the second patterning step having a second feature | the portions of the [first/second] imaging layer that remain after the [first/second] patterning step<br><br>Alternatively, the Defendants proposed:<br><br>the portions of the [first/second] imaging layer that remain after the [first/second] patterning step including the spaces therebetween |

The Court did not adopt either party's proposed language and proposed its own construction at the *Markman* hearing. The Court proposed a construction of the "patterned layer" terms as "a layer containing the portions and spaces of the [first/second] imaging layer that remain after the [first/second] patterning step." J.A. 8. Based on the Court's inclusion of the "a layer containing" language, DSS

agreed with the proposed construction with one clarification: that the "patterned layer" could be a layer that was underneath the imaging layer so long as that layer contained the pattern created in the imaging layer. J.A. 956–57, 969. The Defendants also agreed to the Court's construction, but read the preliminary construction as supporting their position that the "imaging layer" and the "patterned layer" had to be the same "layer" material. J.A. 957–58.

The Court did not resolve the issue at the hearing, and the Court sided with the Defendants in the Claim Construction Opinion. The Court did not address the plain and ordinary usage of the terms "imaging layer" and "patterned layer." The Court instead concluded that the Defendants were correct based on its interpretation of the agreed construction of the term "patterning the [first/second] imaging layer" and the surrounding claim language. J.A. 8. The Court reached this conclusion because the construction of "patterning" recited that the step results in "thereby forming patterned portions and spaces of the imaging layer." *Id.* The Court concluded that, because the claims recite "patterning" an image layer "to form" the patterned layer, each "patterned layer" likewise is limited to the material of the respective imaging layer. J.A. 8–9, 11.

The Court also concluded that claim differentiation did not apply to the "patterned layer" terms. J.A. 12. Claims 4 and 5, as recited above, further refine the "patterning" steps. J.A. 67, claims 4 and 5. The Court held that its

10

construction did not render those claims largely redundant because the claims are directed "towards a positive photoresist system." J.A. 12. The Defendants similarly represented to the Court that claim differentiation did not apply "because claims 4 and 5 are limited to the situation . . . with respect to positive photoresist." J.A. 975–76. Claims 2 and 3 of the '084 Patent, however, are expressly drawn to an imaging layer containing a "positive photoresist," J.A. 67, but the Court did not address those claims in the Opinion. *See* J.A. 977–78.

The Court also looked to the specification. It did not conclude that the specification disclaimed or defined the "patterned layer" as limited to the layer material of the "imaging layer." The Court instead held that its construction was correct because "[e]very example" in the specification taught that the "patterned layer" was the leftover material from the "imaging layer." J.A. 11–12. It concluded that the "patterned layer" could not be a sub-layer underneath the imaging layer because, with regard to "the underlying layers in the specification," the Patent states that "'such layers are not necessary to practice' the disclosed method." J.A. 12 (quoting J.A. 62, '084 Patent, col. 3:11–19). In addition, according to the District Court, the "underlying layers" in the Patent are created by "replicat[ing]" the pattern from the imaging layer (the photoresist) rather than "patterning." J.A. 12 (quoting J.A. 61, '084 Patent, col. 1:23–28, J.A. 66, '084 Patent, col. 12:50–53).

For those reasons, the Court did not adopt DSS's construction of the "patterned layer" terms. DSS then stipulated to a judgment of noninfringement. DSS now appeals the final judgment under 28 U.S.C. § 1295(a)(1) and challenges the District Court's Claim Construction Opinion.

## SUMMARY OF THE ARGUMENT

The District Court improperly limited each "patterned layer" term to the leftover layer material of the "imaging layer." First, the claim recites the "patterned layer" and "imaging layer" as separate "layers," which suggests that the two "layer" elements can be different layers. The District Court did not conclude that the plain and ordinary meaning of the term "patterned layer" required it to be the same layer material, and nothing in the plain meaning of that term limits it in that fashion—a "patterned layer" is simply a layer than contains a pattern, whether it is a patterned imaging layer or a layer that lies underneath the imaging layer. And, consistent with that meaning, the specification indicates that a patterned layer can be (1) the leftover material of the imaging layer or (2) a "layer to be patterned" that lies underneath the imaging layer. J.A. 61, '084 Patent, col. 1:19–27; J.A. 62, '084 Patent, col. 4:5–13. The District Court did not find any lexicography or clear disclaimer in the intrinsic record.

The Court instead limited the "patterned layer" to the layer material of the "imaging layer" based on the parties' agreed construction of "patterning." In the

agreed construction, the "patterning" results in "thereby forming patterned portions and spaces of the imaging layer." But the claims recite "patterning . . . [an] imaging layer . . . to form . . . [a] patterned layer," J.A. 67, '084 Patent, claim 1, and the use of the future tense—"to form"—indicates that the "patterned layer" need not be immediately formed after the "patterning." Under the Court's construction, moreover, dependent claims 4 and 5 are largely redundant of claim 1.

The Court also limited the scope of the "patterned layer" because all of the embodiments in the '084 Patent disclose a "patterned layer" that is the leftover material of the imaging layer after exposure and development. That was error. It is well established that "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004)). The District Court did not find any disclaimer or lexicography, and there is none. Indeed, one portion of the specification teaches that the "layer to be patterned" can lie underneath the imaging layer. J.A. 61, '084 Patent, col. 1:19–27

For these reasons, DSS respectfully requests this Court reverse the judgment of noninfringement, reverse the District Court's construction, and adopt a

construction of "first patterned layer having a first feature" and "second patterned layer having a second feature" that allows a "patterned layer" to encompass a layer underneath the "imaging layer" that contains the same pattern as the patterned imaging layer.

## ARGUMENT

### I.    Standard of Review

The Claim Construction Opinion relied only on intrinsic evidence—the claims and the embodiments in the specification.  J.A. 7–13.  The District Court did not rely upon, and the parties did not present, extrinsic evidence on the "first patterned layer having a first feature" and "second patterned layer having a second feature" limitations.  *See id.*  "Because the only evidence at issue on appeal and presented to the district court in this claim construction was intrinsic," this Court's "review of the constructions is de novo."  *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1023 (Fed. Cir. 2015).

### II.    The District Court Improperly Limited The "Patterned Layer" to the Same Layer Material as The "Imaging Layer"

#### A.    The Plain Claim Language Does Not Restrict the "Patterned Layer" to The Same Layer as The "Imaging Layer"

The plain and ordinary meaning of a "patterned layer" simply denotes a "layer" that contains a pattern.  The plain claim language likewise shows that the

"patterned layer" recited in claim 1 is not limited to the material of the "imaging layer," *i.e.*, the two separately claimed layers need not be the same "layer."

The claims simply require "patterning . . . [an] imaging layer . . . to form . . . [a] patterned layer." J.A. 67, '084 Patent, claim 1. Nothing in the plain and ordinary meaning of "patterning . . . to form" requires the District's Construction. Much like the phrase "reading caselaw to form a legal opinion," the use of the future tense—"to form"—only requires that the "patterned layer" is formed after the "patterning" and that the "patterning" is a necessary input to the formation of the "patterned layer." *See 800 Adept, Inc. v. Murex Sec. Ltd.*, 539 F.3d 1354, 1363 (Fed. Cir. 2008) (concluding, among other things, that "the use of the future tense" in the claim limitation "assigning . . . [data] of a second party that will receive calls" pointed "directly to the conclusion that the assigning step must occur before a call is placed"). The "patterned layer" can form immediately after "patterning" completes (the District Court's construction), but it also could form at a later time (DSS's position).

The use of two different "layer" terms in the claims also supports DSS's position. Claim 1 recites an "imaging layer" and, as a separate claim element, a "patterned layer." DSS had to show that the Defendants employed the claimed "imaging layer[s]" and "patterned layer[s]" to prove infringement, not merely that the imaging layers were patterned. And the claiming of a "patterned layer" as a

different "layer" from the "imaging layer" (as opposed to a "patterned imaging layer") indicates that the two "layers" can be different.

Generally, "[w]here a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp.*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quoting *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004)); *see also Engle Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1404–05 (Fed. Cir. 1996) (concluding that two separate elements could not "be one and the same"). That rule, of course, is not absolute. The Court may construe two separate claim elements as additionally covering a single material structure if the intrinsic record supports that construction. *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231–32 (Fed. Cir. 2012) (construing a "cutting box" and a separately claimed "dust collection structure" as encompassing an integral structure because the specification taught that the elements could be a single structure); *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1303–04 (Fed. Cir. 2011) (construing the "needle holder" and "retainer member" elements as covering a unitary structure because the patents indicated that the elements could "structurally overlap" and "could be formed as an integral structure").

Similar to the patents at-issue *Powell* and *Retractable*, the '084 Patent indicates that the "imaging layer" and the "patterned layer" can also be the same "layer" of material.  Indeed, that fact is undisputed.  Thus, claims cover both scenarios: when the "imaging layer" and "patterning layer" are the same layer and when those layers are different layers.  The claim language does not warrant limiting the claims to the former embodiment.

The District Court came to a different conclusion.  The Court did not hold, and the Defendants did not contend, that the plain and ordinary meaning of "patterned layer" and the "imaging layer" are the same layer material.  Instead, the Court determined that the patterning of the imaging layer "forms" (rather than "to form") the patterned layer because the parties agreed to a definition of "patterning" as "exposing an imaging layer . . . and developing the imaging layer . . ., *thereby forming the patterned portions and spaces of the imaging layer*."  J.A. 8–9, 11 (emphasis added). The agreed construction of "patterning," however, does support the District Court's construction.

First, the plain claim language requires the patterning of the imaging layer is used "to form" the patterned layer.  The use of the future tense "to form" coupled with the distinct "layers" in the claims—an "imaging layer" and a separate "patterned layer"—weighs against limiting the "patterned layer" to the same layer material of the "imaging layer."  The agreed construction of "patterning" does not

remove that language from the claims.  "Claims must be interpreted with an eye toward giving effect to all terms in the claim," *Becton*, 616 F.3d at 1257, and it is improper to erroneously mold claim language using an agreed construction of a separate term.[1]

Second, the agreed construction of "patterning . . . [an] imaging layer" actually supports DSS's position.  The construction does not require the "patterned layer" to be immediately formed upon development.  Instead, the construction recites that the exposure and development steps result in "thereby forming *patterned portions and spaces of the imaging layer*." J.A. 6 (emphasis added). That patterned imaging layer may be, but is not required to be, a "patterned layer." Indeed, substituting the agreed construction of "patterning" into claim 1 shows that a "patterned layer" can be formed after development: "exposing an imaging layer to radiation . . . and developing the imaging layer . . ., ***thereby forming patterned portions and spaces of the imaging layer to form . . . [a] patterned layer***." Indeed, the specification teaches that the "patterned photoresist layer," *i.e.*, the "patterned portions and spaces of the imaging layer," may reside "over the

---

[1] Before the District Court, the Defendants wrongly contended that DSS put before the District Court a construction of "patterning" that was inconsistent with the construction it proposed to the Patent Appeal & Trial Board ("PTAB") in co-pending *Inter Partes* Review Proceedings.  Besides being incorrect, the Defendants' assertion is irrelevant in the appeal: the District Court did not adopt the construction of "patterning" that DSS proposed to the PTAB, and the Defendants, like DSS, agreed to the District Court's construction of "patterning."

underlying layer to be patterned." J.A. 61, '084 Patent, col. 1:19–27. In that disclosure, the patterned photoresist layer created by the patterning is used "to form" the "patterned layer." In sum, the plain claim language—as well as the agreed construction of "patterning"—shows that the District Court erred when it limited the "patterned layer" to the same layer material as the "imaging layer."

### B. Dependent Claims Indicate That The "Patterned Layer" Need Not Be The Same Layer Material as The "Imaging Layer"

Dependent claims 4 and 5 indicate that the District Court's construction is incorrect. "Differences among claims can . . . be a useful guide in understanding the meaning of particular claim terms," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). One of those tools is claim differentiation: The presence of a dependent claim "'that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim.'" *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim*, 358 F.3d at 910). That presumption is especially strong when "the limitation in dispute is the only meaningful difference between an independent and dependent claim." *Hill-Rom*, 755 F.3d at 1374.

Dependent Claims 4 and 5, under the District Court's construction, cover the situation in which the "patterned layer" is the portion of the "imaging layer" that dissolves as a result of exposure and development:

>   The method of claim 1, wherein the [patterning step (b) / patterning step (e)] includes the steps of:
>
>   (i) exposing a portion of the [first/second] imaging layer to radiation; and
>
>   (ii) *developing the [first/second] imaging layer* such that the exposed portion dissolves *to form the [first/second] patterned layer*.

J.A. 67, '084 Patent, claims 4 and 5.  That construction renders these claims largely redundant of claim 1.  Under the District Court's construction of the phrase "patterning . . . [an] imaging layer to form . . . [a] patterned layer" in claim 1, the "pattern layer" is restricted to the "patterned portions and spaces of the imaging layer" after development, *i.e.*, a patterned photoresist layer.  J.A. 6, 8, 11. Claims 4 and 5, however, expressly recite "developing . . . [an] imaging layer . . . to form . . . [a] patterned layer," and the imaging layer following development is likewise a patterned photoresist layer.

The District Court, however, concluded that claim differentiation did not apply because claims 4 and 5 add limitations "directed towards a positive photoresist system." J.A. 12.  That was error.  Claims 2 and 3 are expressly drawn to methods in which the imaging layer "includes a positive photoresist." J.A. 67, '084 Patent, claims 2 and 3.  Thus, the District Court's reading of claims 4 and 5 would effectively read claims 2 and 3 out of the Patent.

## C.    The Specification Does Not Limit a "Patterned Layer" to The Layer Material of The "Imaging Layer"

Nothing in the specification limits the "patterned layer" to the material of the "imaging layer."  Given the plain language of the claims and their different claim scope, the District Court's construction can only be upheld if (1) the patentee acted as a lexicographer to define the "patterned layer" terms; or (2) the patentee disavowed the full claim scope in the specification or prosecution history.  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  "The standards for finding lexicography and disavowal are 'exacting.'"  *Pacing Techs.* 778 F.3d at 1024 (quoting *GE Lighting Solutions*, 750 F.3d at 1309).  Notably, the District Court did not find lexicography or disavowal.  And the intrinsic evidence here does not meet that exacting standard.

The specification indicates, consistent with the claim language, that the "patterned layer" and the "imaging layer" may be separate layers. The specification discloses that typical lithography processes can have three steps: (1) depositing a layer of photoresist (*i.e.*, an imaging layer); (2) then creating a pattern in that photoresist layer (*i.e.*, the "patterned photoresist layer" that the District Court limited the "patterned layer" to); and (3) then replicating that pattern in an "underlying layer" (*i.e.*, another patterned layer).  J.A. 61, '084 Patent, col. 1:19–28.

21

Despite that broader disclosure, the District Court limited the claims because "[e]very example" in the embodiments taught the "patterned layer" is the material of the imaging layer leftover after patterning. J.A. 11–12. But that conclusion does not warrant limiting the plain claim language. This Court has repeatedly held that "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *GE Lighting Solutions*, 750 F.3d at 1309 (quoting *Liebel-Flarsheim*, 358 F.3d at 913). There is no such evidence here. To the contrary, the intrinsic record points in the opposite direction—the specification contains a broader disclosure in which a patterned photoresist layer sits on top of an underlying layer to be patterned and the pattern in the photoresist is then replicated in that underlying layer. J.A.61, '084 Patent, col. 1:19–28.

The District Court did not find a disclaimer or disavowal of that teaching, and there is none. The Court instead disregarded that teaching for three other reasons, each of which was erroneous. First, the Court concluded that the broader teaching was "counter to the totality of the remainder of the disclosure." J.A. 12 n.1. Second, the Court held that, in the broader disclosure, the "pattern" was "in the photoresist" and then was subsequently "replicated in the underlying layer." J.A. 12 n.1 (quoting J.A. 61, '084 Patent, col. 1:23–28). The Court concluded that

the specification taught that "replicat[ing]" was different than "patterning." J.A. 12 (quoting J.A. 66, '084 Patent, col. 12:50–53). Lastly, the District Court determined that the teachings relating to "underlying layers" were not relevant because the specification explains that those layers "'are not necessary to practice' the disclosed method." *Id.* (quoting J.A. 62, '084 Patent, col. 3:11–19).

That analysis was in error. That the specification contains a "counter" teaching to the preferred embodiments is not a clear disclaimer of that teaching: if anything, it shows that it is improper to exclude that counter teaching from the claims. *TomTom, Inc. v. Adolph*, --- F.3d --- , 2015 U.S. App. LEXIS 10328, at *26–28 (Fed. Cir. June 19, 2015) (holding that the district court erroneously limited the claims to an embodiment where nothing in the claims required that limitation and "one portion of the specification" contained a broader disclosure).

The District Court also erred in its analysis of the disclosure of a layer of patterned photoresist that sits "over the layer to be patterned." J.A. 61, '084 Patent, col. 1:19–27. The disclosure of a "pattern" in the photoresist that lies atop the "layer to be patterned" supports DSS's claim construction position—the "patterned layer" term encompasses the (1) patterned photoresist layer *and* (2) an underlying later that is "patterned" with the pattern in photoresist layer.

Moreover, the Patent does not exclude from the "patterned layer" an underlying layer that contains a pattern that was "replicated" into the layer via

etching or some other process.  The plain language of the phrase "patterning . . . to form" only requires that the "patterned layer" is formed after the "patterning" and that the "patterning" is a necessary input to the formation of the "patterned layer."  Thus, the claim language does not exclude replicating the patterned portions and spaces of the imaging layer into an underlying later.

But even the passage of the specification the District Court relied upon shows that the Court's distinction between "patterning" and "replicating" is incorrect.  The passage teaches the "patterning [of] an underlying layer," and it explains that the underlying layer "may be patterned using a suitable etch technique."  J.A. 66, '084 Patent, col. 12:45–53.  By that process, the pattern "becomes replicated in the underlying layer."  *Id.*

Finally, the District Court erred when it found that the teachings relating to "underlying layers" were not relevant because the specification teaches that those layers "'are not necessary to practice' the disclosed method." J.A. 12 (quoting J.A. 62, '084 Patent, col. 3:11–19).  Notably, the passage the District Court quoted recites that the underlying layers are "not necessary to practice *the method of Fig. 1*," an embodiment of the claims.  J.A. 62, '084 Patent, 3:11–19.  That statement does not give rise to lexicography or disclaimer to exclude an "underlying layer" from the construction of "patterned layer."  Claims may be, and often are, broader than the embodiments disclosed.  DSS agrees that the underlying layers are not

required to practice Figure 1.  But the "patterned layer" of the claims encompasses the (1) patterned photoresist layer (which does not require an underlying layer) and (2) a layer that contains the pattern from the patterned photoresist layer (which may require an underlying layer).  In any event, the District Court did not find that the specification contained a disclaimer or disavowal, and, as recounted above, there is none.

In short, nothing in the specification limits the claimed "patterned layer" to the layer material of the "imaging layer."  There is no lexicography or disavowal. And the specification contains a broader disclosure of the "layer to be patterned" residing underneath the "imaging layer."

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The plain and ordinary meaning of "patterned layer," the plain claim language, and the specification support a construction of "patterned layer" that encompasses both (1) a patterned imaging layer and (2) a layer that underlies the imaging layer that contains the same pattern as the patterned imaging layer.  While it is true that embodiments only disclose the first flavor of a "patterned layer," nothing in the intrinsic record disclaims the second flavor.  For the foregoing reasons, DSS respectfully requests that the Court reverse the judgment of noninfringement and remand this case to the District Court for further proceedings.

Dated: July 28, 2015                    Respectfully submitted,

_____
CHRISTIAN HURT

DEREK GILLILAND
STATE BAR NO. 24007239
NIX PATTERSON & ROACH, L.L.P.
205 Linda Drive
Daingerfield, Texas 75638
903.645.7333 (telephone)
903.645.5389 (facsimile)
dgilliland@nixlawfirm.com

EDWARD CHIN
STATE BAR NO. 50511688
CHRISTIAN J. HURT
STATE BAR NO. 24059987
NIX PATTERSON & ROACH, L.L.P.
5215 N. O'Connor Blvd., Suite 1900
Irving, Texas 75039
972.831.1188 (telephone)
972.444.0716 (facsimile)
edchin@me.com
christianhurt@nixlawfirm.com

*Attorneys for Plaintiff-Appellant,*
*DSS Technology Management, Inc.*

26

# ADDENDUM

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| DSS TECHNOLOGY MANAGEMENT, INC., | § § § | |
| v. | § § | Civil Action No. 2:14–CV–199–RSP |
| TAIWAIN SEMICONDUCTOR MANUFACTURING COMPANY, LIMITED, et al. | § § § § | |

**CLAIM CONSTRUCTION
MEMORANDUM AND ORDER**

DSS Technology Management, Inc. ("DSS") asserts U.S. Patent No. 5,652,084 (hereinafter the "'084 patent")[1] against Taiwan Semiconductor Manufacturing Company, Limited, TSMC North America, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America L.L.C., Samsung Semiconductor, Inc., Samsung Austin Semiconductor LLC, and NEC Corporation of America (collectively, "Defendants"). On March 3, 2015, the Court held a hearing to determine the proper construction of the disputed claim terms in the '084 patent. After considering the arguments made by the parties at the hearing and in the parties' claim construction briefing and charts (Dkt. No. Nos. 116, 126, 130, and 131), the Court issues this Claim Construction Memorandum and Order.

---

[1] References to the '084 patent will be made in the format, "Col:Line"

## BACKGROUND

The '084 patent is entitled "METHOD FOR REDUCED PITCH LITHOGRAPHY" and is based upon an application filed October 22, 1996 and claims priority to an application filed December 22, 1994. Claims 1–7 and 10 are asserted in the litigation. Each disputed claim term is recited in the first instance in independent claim 1. Defendants assert that one disputed term is indefinite under 35 USC § 112, ¶ 2. The '084 patent is the subject of two petitions for *inter partes* review ("IPR"): one filed by Taiwan Semiconductor Manufacturing Company, LTD ("TSMC") and one filed by the Samsung Electronics Co. Both IPR petitions have been granted and a consolidated review is proceeding.

The '084 patent generally relates to the field of lithography processing for semiconductor fabrication. 1:9–12. The disclosed lithographic patterning process uses multiple exposures to provide a reduced pitch for features of a single pattern layer. Abstract. More particularly, a first imaging layer is exposed to radiation in accordance with a first pattern and developed. A second imaging layer is subsequently formed to surround the first patterned layer, exposed to radiation in accordance with a second pattern, and developed to form a second patterned layer. *Id*. The first patterned layer remains with the second patterned layer to produce a single patterned layer. *Id*. The techniques provide a reduced pitch for features, denser semiconductor devices, and smaller-sized semiconductor devices. 1:39–45.

## APPLICABLE LAW

### 1.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303,

1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own

terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id*. Generally, extrinsic

evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

## 2. Claim Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. Whether a claim meets this definiteness requirement is a matter of law. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1344 (Fed. Cir. 2007). A party challenging the definiteness of a claim must show it is invalid by clear and convincing evidence. *Id*. at 1345. "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), abrogated on other grounds by *Nautilus v. Biosig Instruments, Inc.,* 134 S. Ct. 2120 (2014).

The definiteness standard of 35 U.S.C. § 112 ¶2 requires that:

> a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable. The standard we adopt accords with opinions of this Court stating that "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter.

*Nautilus, Inc.*, 134 S. Ct. at 2129–30 (internal citations omitted).

## AGREED TERMS

The parties have agreed to the following terms. (Dkt. No. 131–1 at 1–3.)

| Term | Agreed Construction |
|------|---------------------|
| "first imaging layer" | "a first layer of photoresist or other radiation-sensitive material" |
| "second imaging layer" | "a second layer of photoresist or other radiation-sensitive material" |

At the oral hearing, the parties also agreed to follow construction as proposed by the Court.

Hearing Tr. at 7–8.

| Term | Agreed Construction |
|------|---------------------|
| "patterning the [first/second] imaging layer" | "exposing an imaging layer to radiation in accordance with a specific pattern and developing the imaging layer so that portions of the imaging layer laying outside of the pattern are dissolved in the developer, thereby forming patterned portions and spaces of the imaging layer" |

## DISPUTED TERMS

### 1. The Layer Disputes

**"patterning the [first/second] imaging layer"[2]**

| DSS's Construction | Defendant's Construction |
|--------------------|--------------------------|
| "exposing an imaging layer to radiation in accordance with a specific geometric pattern and developing the imaging layer so that portions of the imaging layer laying outside of the geometric pattern are dissolved in the developer" | "patterning" refers to a two-stage process: (1) an imaging layer is exposed to radiation in accordance with a specific pattern, and (2) the imaging layer is developed so that portions of the imaging layer laying outside of the pattern are dissolved in the developer, thereby forming a patterned layer" |

**"first patterned layer having a first feature" / "second patterned layer having a second feature"**

| DSS's Construction | Defendant's Construction |
|--------------------|--------------------------|
| "a layer containing the pattern defined by the portion of the first imaging layer that remains intact after the patterning step having a first feature"<br><br>"a layer containing the pattern defined by the portion of the second imaging layer that | "the portions of the [first/second] imaging layer that remain after the first patterning step"<br><br>Alternatively, Defendants propose the following modified construction: |

[2] Though the parties have agreed to the "patterning the [first/second] imaging layer" terms, the Court provides the constructions proposed by the parties to provide further context to the disputes regarding the layer terms. In addition, much of the arguments for "patterning the [first/second] imaging layer," "first patterned layer having a first feature," and "second patterned layer having a second feature" overlap.

A6

| remains intact after the second patterning step having a second feature" | "the portions of the [first/second] imaging layer that remain after the [first/second] patterning step including the spaces therebetween" |
|---|---|

A number of disputes raised by the parties with regard to these terms have been resolved by the parties either in the briefing or at the oral hearing. DSS originally asserted that Defendants sought to limit "layers" to just the portions of a layer that remain after patterning as opposed to a construction where the layer can include the material that remains after the patterning and the spaces between the material. Defendants clarified in their briefing that features can include both the material remaining and the spaces between the material. (Dkt. No. 126 at 5.) At the oral hearing, the parties also resolved the dispute regarding DSS's inclusion of "geometric" by agreeing not to include such language. Hearing Tr. at 8–10, 31.

With regard to the "patterning the [first/second] imaging layer," the primary remaining dispute presented in the briefing related to Defendants' inclusion of "thereby forming a patterned layer." Defendants asserted that this language addressed the real issue between the parties. Defendants asserted that the dispute related to whether the result of the patterning step is the patterned layer. (Dkt. No. 126 at 6–7.) That is, whether the first patterned layer is a portion of the imaging layer that was patterned, or whether the patterned layer can be a sub-layer below the imaging layer that was subsequently etched and now is patterned with the pattern that was in the imaging layer. (*Id.*) As to "patterning the [first/second] imaging layer," the construction agreed to by the parties at the oral hearing was proposed by the Court. Hearing Tr. at 7–8. This construction specifically included a conclusion that substantively matched Defendants' proposal by including "thereby forming patterned portions and spaces of the imaging layer." *Id.*

At the oral hearing, the Court also proposed a construction for "first patterned layer having a first feature" and "second patterned layer having a second feature." The dispute

regarding these terms raised the same issue: whether the result of the patterning step is the patterned layer, and, thus is the first patterned layer a portion of the imaging layer that was patterned, or whether the "patterned layer" can include a sub-layer below the imaging layer that was subsequently etched and now is patterned with the pattern that was in the imaging layer. (Dkt. No. 126 at 6–7; Dkt. No. 130 at 1–3.) In particular, the Court proposed: "a layer containing the portions and spaces of the [first/second] imaging layer that remain after the [first/second] pattern step." Hearing Tr. at 8.

Again, the Court's proposal adopted the substance of Defendants' proposal.[3] At the oral hearing, DSS accepted the Court's proposal with a caveat that the "layer" did not have to include the portions (or spaces) of the corresponding imaging layer. Hearing Tr. at 8–9. As discussed below, the Court adopts the construction it proposed at the oral hearing and specifically rejects DSS's caveat. Further, to the extent DSS intends to interpret the construction of "patterning the [first/second] imaging layer" to similarly allow for DSS's caveat, the Court rejects such an interpretation as well.

The construction for "patterning the [first/second] imaging layer" explicitly includes "exposing an imaging layer . . . , thereby forming patterned portions and spaces of the imaging layer." The terms being construed must be read together in the context of the entire step (b) (or step (e)) (Emphasis added). For example, step (b) recites: "patterning the first imaging layer in accordance with a first pattern to form a first patterned layer having a first feature." (Emphasis added). The constructions adopted by the Court for the sub-parts of these phrases as a whole indicate that the "patterning" step forms "patterned portions and spaces of the imaging layer." Further, the patterned layer that results from the claimed "to form" phrase is a layer that contains

---

[3] Defendants agreed to the Court's proposal at the oral hearing. Hearing Tr. at 10.

A8

"the portions and spaces of the [first/second] imaging layer." Thus, the patterning forms "patterned portions and spaces of the imaging layer" and the "patterned layer" contains these same portions: "a layer containing the portions and spaces of the [first/second] imaging layer that remain after the [first/second] patterning step."

Positions of the Parties

DSS argues the claims merely require the layers to "have a feature" and, thus, the use of the word "having" allows each layer to include more than just a feature. (Dkt. No. 116 at 3.) DSS argues that the claim language does not restrict the location of the "patterned layer" to what remains of the "imaging layer." DSS asserts that the claims do not recite a "patterned image layer." (Dkt. No. 130 at 2.) DSS asserts that the use of an "image layer" and a separate "patterned layer" in the claims strongly suggests that the two layers can be different. (Dkt. No. 130 at 2.) DSS asserts that the claims thus cover both scenarios: where the image layer and pattern layer are the same layer and when those layers are different layers. (*Id.*) DSS asserts that the claims only require patterning an image layer "to form" a patterned layer and, thus, this strongly implies that the image layer and the patterned layer do not have to be the same layer.

At the oral hearing, DSS asserted that the specification passages at 1:23–25 and 5:62–63 support its position that the patterned layer does not have to be the image layer after patterning. Hearing Tr. at 30. DSS also asserts that dependent claims 4 and 5 recite specific examples of patterning (e.g., exposing and developing) thus indicating that claim 1 is broader and not restricted to exposing and developing an image layer to form a patterned image layer. (Dkt. No. 130 at 3.) Defendants further assert that their construction of the first term ends with "thereby forming a patterned layer" because the surrounding claim language makes clear that the image patterning process forms the patterned layer. (Dkt. No. 126 at 6–7.)

In particular, Defendants assert that the claim language states "patterning the [first/second] imaging layer in accordance with a [first/second] pattern to form a [first/second] patterned layer having a [first/second] feature." Defendants thus assert that the full claim language makes clear that it is the patterning of the imaging layer that forms the patterned layer. Defendants assert that DSS's constructions of "[first/second" patterned layers" and "[first/second] patterned layer having a [first/second] feature" would encompass the layers that are formed under the respective imaging layers by subsequent steps, such as etching steps. (Dkt. No. 126 at 6–7.)

Defendants assert that the claims are directed toward forming patterns in the imaging layers, not the subsequent processing steps. Defendants also assert that the '084 patent is directed toward a lithography method for forming patterns and there is no reason to include non-lithographic processes in forming the claimed patterned layer. Thus, Defendants assert the formed "pattern layer" is the patterned imaging layer. (Dkt. No. 126 at 6.) Defendants assert that the overall claim language is "patterning" the image layers to "form" the patterned layers, and thus, the first and second patterned layers are the patterned imaging layers, not the underlying layers. (Dkt. No. 126 at 6–7.)

Defendants also assert that the specification makes clear that the patterned layers are a portion of the imaging layers that remain after the patterning steps. Defendants assert that the specification consistently states that "patterning" (e.g., exposing and developing) the image layers results in the patterned layers. *See* 3:65–4:6 (imaging layer is "developed in a suitable developer to form a first patterned layer 232"), 4:9–24, 6:64–7:12, Figures 2–5. Defendants assert that the specification never describes the underlying layers as the patterned layer.

A10

Defendants object to DSS's construction as defining the patterned layer not as the portions of the imaging layer, but instead as other layers "defined" by the remaining portions of the imaging layer. Defendants assert that the specification distinguishes between what "defines" a layer (i.e., a mask) and the element that contains the pattern (i.e., the patterned imaging layer). (Dkt. No. 126 at 9.) Defendants further assert that DSS's construction effectively reads out the embodiments of Figures 2 through 5 in which the patterned layers are the remaining portions of the respective imaging layer. (Dkt. No. 126 at 9.)

Analysis

The Court's analysis begins with the claims themselves. *Phillips*, 415 F.3d at 1314. The language of the entirety of the claim phrases in question supports Defendants' construction. For example, claim 1 step (b) recites "patterning the first imaging layer . . . to form a first patterned layer." Step (e) has similar language with regard to the second imaging layer. Thus, the claim language indicates that the "patterning" of the imaging layer itself "forms the patterned layer." DSS's positions are in conflict with the natural reading of the claims. DSS seeks to have the "patterned" layer be a layer "containing the pattern defined by" a portion of the first imaging layer. However, such a construction is in conflict with the claim language that states that the patterning of the imaging layer actually forms the patterned layer. Furthermore, the specification also makes clear that the patterning of the image layer forms the patterned layer.

Every example in the specification teaches that the pattern of the imaging layer is what forms the patterned layer, not some undescribed subsequent etching steps. For example, with regard to Figure 3, a "portion of image layer 220 . . . remains to form first patterned layer 232." 4:9–12. Similarly, in another embodiment for Figure 3, a "portion of imaging layer 220 . . . remains to form first patterned layer 232." 4:24–27. Likewise in Figures 4 and 5,

"imaging layer 240 may then be developed . . . to form a second patterned layer that includes features 251 and 253" and "that portion of imaging layer 240 that has not been exposed . . . remains to form features 251 and 253 for the second patterned layer." 6:51–59. Thus, the specification describes the "patterned layer" created by the patterning step as the portions of the image layer that remain after patterning.

As to the underlying layers in the specification examples, the specification states that such layers "are not necessary to practice" the disclosed method. 3:11–19. Furthermore, though not shown in the embodiments, subsequent etching of the underlying layer is described as being separate and distinct from the patterning step: "the single patterned layer illustrated in FIGS. 5, 11, and 16, becomes replicated in the underlying layers." 12:50–53.[4] With regard to DSS's claim differentiation argument regarding "patterning" as it applies to dependent claims 4 and 5, such argument fails for several reasons. First, both parties proposed and agreed to constructions that indicated that "patterning" related to exposing and developing an image layer. Second, claims 4 and 5 add the particular limitation that the "exposed portion dissolves." Thus, these dependent claims add limitations directed toward a positive photoresist system. These claims do not indicate that "patterning" of the imaging layers "to form" the patterned layers encompasses subsequent etch steps.

Defendants' positions conform to the natural reading of the claims. Furthermore, when looking to the specification to provide context to the claim language, the specification also

---

[4] When asked at the oral hearing to provide examples in the disclosed embodiments that matched DSS's construction, DSS could not cite an embodiment. Rather, DSS cited to one portion of the background of the invention as a counter to the totality of the remainder of the disclosure. Hearing Tr. at 30. However, even that portion describes the "pattern" as being in the photoresist: "the pattern in the photoresist is thus replicated in the underlying layer." 1:23–28. DSS also cited to a portion of the disclosure at 5:62–62. Hearing Tr. at 30. However, that portion of the specification relates to the second imaging layer in relation to the pattern formed in the first imaging layer, not the second imaging layer and the second patterned layer. 5:56–5:65.

supports Defendants' positions. Finally, the Court notes Defendants' arguments are not inconsistent with DSS's argument that the imaging layer and the patterned layer are two terms in the claim, and, thus must be different layers. As shown for example with regard to Figure 2, the imaging layer 220 (before patterning) is a different layer than the patterned layer 232. Though both layers may be formed of the photoresist, one layer is not patterned and one layer is patterned. Thus, the differences provide context for reciting different terminology in the claims. The same can be said with regard to the second imaging layer and second patterned layer of Figures 4 and 5.

The Court adopts as its construction, "a layer containing the portions and spaces of the [first/second] imaging layer that remain after the [first/second] patterning step." At the oral hearing, Defendants' expressed agreement to the construction adopted by the Court herein. Hearing Tr. at 10. The Court further rejects DSS's interpretation of the Court's construction it proposed at the oral hearing. The Court's construction explicitly states that the layer contains "<u>the</u> portions and spaces <u>of</u> the [first/second] imaging layer <u>that remain</u>. . . ." (Emphasis added). DSS's interpretation is not consistent with the requirements of the Court's construction. Accordingly, the Court construes

**"first patterned layer having a first feature" / "second patterned layer having a second feature" to mean "a layer containing the portions and spaces of the [first/second] imaging layer that remain after the [first/second] patterning step."**

### 2. Patterns

**"first pattern"**

| DSS's Construction | Defendant's Construction |
|---|---|
| "a first geometric pattern according with which the first imaging layer is selectively irradiated" | "a pattern in accordance with which the first imaging layer is selectively irradiated" |

**"second pattern"**

| DSS's Construction | Defendant's Construction |
|---|---|
| "a second geometric pattern— separate from the first pattern—in accordance with which, the second imaging layer is selectively irradiated" | "a pattern in accordance with which the second imaging layer is selectively irradiated" |

At the oral hearing, DSS agreed to remove "geometric" from its construction. Hearing Tr. at 31. The only issue remaining between the parties is whether the first pattern and the second pattern have to be different as, for example, DSS interprets its "separate from the first pattern" language to require the two patterns to be different.

Positions of the Parties

DSS asserts that by reciting "first" and "second" patterns, the claims raise a clear implication that the patterns are different from one another. DSS asserts that the specification teaches that the first and second patterns are not the same. DSS points to Figure 2 (opaque feature 222 and clear features 221 and 223) in contrast to Figure 4 (opaque features 242 and 244 and clear features 241, 243, and 245). Thus, DSS asserts the claims and specification show that the two patterns must have "different" shapes." (Dkt. No. 116 at 12.) DSS also asserts that the geometry of each "feature" is determined by the patterns and, thus, the patterns must also be distinct because, as the claim later recites, that the second pattern layer has "a second feature distinct from the first feature." (*Id.*)

Defendants assert that the specification repeatedly states that the first and second imaging layers may be exposed using "any suitable pattern of opaque and clear features that may depend, for example, on the desired pattern to be formed in [the] imaging layer." 3:59–62, 6:23–25, 8:11–14, 8:65–9:1, 10:61–64, and 11:49–52. Defendants assert that while different shapes would be allowed, there is no support in the specification requiring the use of different shapes.

Defendants assert that in semiconductor lithography, the transferred pattern depends upon the arrangement of the features in the mask and the orientation of the mask in relation to the imaging layer. Defendants assert that two masking steps involving the same pattern, but shifted with respect to each other, could render two sets of patterns on a wafer. (Dkt. No. 126 at 13.)

Defendants assert that just because the "first" and "second" patterns are listed does not mean that the patterns have to be shaped differently, but rather it merely is a use of common patent convention for identifying the "first" and "second" elements in a claim. (Dkt. No. 126 at 13–14.) Defendants assert that they do not contest that the first and second patterns are separate elements; just that the two patterns do not have to be different. (Dkt. No. 126 at 14.) Defendants assert that is well recognized in patent law convention that "first" and "second" can mean repeated instances of an element. (Dkt. No. 126 at 14) (citing *Free Motion Fitness, Inc. v. Cybex, Int'l, Inc.*, 423 F.3d 1343, 1347–48 (Fed. Cir. 2005)). Defendants assert that the claim language merely associates the first pattern with the first imaging layer and the second pattern with the second imaging layer. Defendants also assert that "first" and "second" are also used with regard to the imaging layers and there is no dispute that the two imaging layers can be two similar layers of the same type of photoresist.

Defendants assert that in the related U.S. Application 08/740,014—sharing a common specification with the '084 patent—DSS attempted to explicitly require the first and second patterns be different:

> 12. A lithography method for semiconductor fabrication using a semiconductor wafer, comprising the steps of: …(d) patterning the imaging layer in accordance with a second pattern to form a patterned layer, *said second pattern being different than said first pattern*, wherein the patterned layer has adjacent feature which are formed relatively closer to one another than is possible through a single exposure to radiation.

(Dkt. No. 126 Ex. F '014 File History, at 36) (italics emphasis added). Defendants assert that the examiner rejected DSS's amendment under 35 USC § 112 because the specification did not support a first pattern different from the second pattern. (*Id.* at 39.) Defendants assert that Court should not now rewrite the claim to import a limitation that the Patent Office found was not disclosed in the specification. (Dkt. No. 126 at 15.) Defendants also assert that the PTAB has also rejected DSS's proposal, explicitly finding that the first and second patterns did not have to be a different geometry:

> The geometry of the second pattern, however, is not necessarily different from the first pattern. See, e.g., Figs. 7–11, 13–16. The Specification provides, and Patent Owner acknowledges, that: "The second mask may include any suitable pattern of opaque and clear features that may depend, for example, on the desired pattern to be formed in imaging layer 240." Ex. 1001, 6:23–25; Prelim. Resp. 14. Patent Owner does not specify why a second mask that duplicates the geometry or pattern of the first mask would not be suitable.

(Dkt. No. 126 Ex. G at 7–8.)

As to DSS's argument that Figures 2 and 4 show different patterns, Defendants assert such an argument is at a minimum an invitation to commit clear error by importing exemplary embodiments contained in the figures. (Dkt. No. 126 at 16) (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.")). Defendants further state that it is not clear that the masks used to form the patterns in Figures 2 and 4 are actually different masks, as the figures could merely depict the same mask shifted horizontally.

Defendants also cite to Figures 7–10 that depict first and second patterns that create identically shaped features, demonstrating that masks with identical geometries can create distinct features. (Dkt. No. 126 at 16–17.) Finally, Defendants assert that DSS's argument

regarding the figures is contradicted by the specification that repeatedly states that the first and second patterns may be "any suitable pattern." 3:59–62, 6:23–25, 8:11–14, 8:65–9:1, 10:61–64, and 11:49–52.

Analysis

It is common patent law convention to use "first" and "second" to reference repeated instances of a similar element. *See Free Motion Fitness, Inc. v. Cybex, Int'l, Inc.*, 423 F.3d 1343, 1347–48 (Fed. Cir. 2005). The claim terms themselves, "first pattern" and "second pattern," are not indicative of a deviation from such convention. Such a conclusion also matches the context of the surrounding claim language that references a patterning step of a "first imaging layer" and a patterning step of a "second imaging layer." In context, the use of "first" and "second" more appropriately references the two-step aspect of the claimed process.

DSS would have this Court import an embodiment from the specification. Such a conclusion is wrong for multiple reasons. First, there is no disavowal or clear disclaimer of the well understood claim language. In contrast, the specification clearly states repeatedly that "any suitable pattern of opaque and clear features that may depend, for example, on the desired pattern to be formed in [the] imaging layer." 3:59–62, 6:23–25, 8:11–14, 8:65–9:1, 10:61–64, and 11:49–52. In this regard, the specification could not be clearer: a particular pattern is not required for the first and second patterns. Second, it is not even clear that in the exemplary specification embodiments, the first and second patterns are different. For example, the first and second patterns shown in Figures 2–5, 7–11 and 13–16, respectively, may each be the same pattern, just merely shifted horizontally.

The conclusion that the first and second patterns do not have to be different is also supported by the prosecution history. As noted above, the Patent Office has twice rejected DSS's

A17

construction. First, the PTAB has specifically rejected DSS's position in the IPR. In addition, the Patent Office rejected the "different" requirement as not being supported by the specification in a related case having a common specification. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) (looking to the prosecution history in other applications). Accordingly, the Court construes

**"first pattern" to mean "a pattern in accordance with which the first imaging layer is selectively irradiated" and construes "second pattern" to mean "a pattern in accordance with which the second imaging layer is selectively irradiated."**

### 3. "a second feature distinct from the first feature"

| DSS's Construction | Defendant's Construction |
| --- | --- |
| "a second feature that has a different geometric shape than the first feature"<br><br>The difference in geometric shape is determined from a top-down view (e.g., in the x-y plane of the semiconductor wafer). | "a feature of the second patterned layer that is not in contact with and does not overlap with the first feature of the first patterned layer" |

At the oral hearing, the Court proposed a construction of "a second feature distinguishable from the first feature." The Court's proposed construction further expressly rejected DSS's "geometric shape" proposal and expressly rejected Defendants' proposal that the feature "does not overlap." At the oral hearing DSS agreed to the Court's construction. Hearing Tr. at 37. The primary issue left in dispute is what does "distinct" features mean and more particularly, does the prosecution history limit the term to mean features that do not overlap.

Position of the Parties

Defendants assert that while "distinct" is not found in the specification, it can be understood in the context of the claims as a whole, the specification, and the prosecution history.

Defendants assert that the stated purpose of the '084 patent is to provide a "relatively reduced pitch for features" for the fabrication of "relatively denser" semiconductor devices. 1:39–42. Defendants assert that this is reflected in claim 1 as "the first and second features . . . are formed relatively closer to one another than is possible through a single exposure to radiation." Defendants assert that when determining if two features are "relatively closer" to one another, the parameter of interest is the distance between the two features. Defendants assert that in this context "distinct" features means not in contact, separate features. (Dkt. No. 126 at 18.)

Defendants assert that statements made by the Applicant during prosecution further limit the term "distinct" to non-overlapping features. In particular, Defendants point to the arguments made to overcome a rejection based on the IBM Technical Disclosure volume 32, number 8A ("Disclosure 1"). DSS reproduces portions of Disclosure 1 and highlights the overlapping and non-overlapping features:



(Dkt. No. 126 at 21) (annotating Disclosure 1). Defendants assert that the examiner's rejection focused on the "coincident" or overlapping features formed by the openings A, C, D, and E. (Dkt. No. 126 Ex. H '084 File History at 5.) Defendants assert that features A, C, D, and E are distinguishable in several respects: for example, they are of different widths and are defined by different layers of photoresist. Defendants assert that despite DSS's suggestion that "distinct" means "distinguishable to the eye or mind as discrete" (Dkt. No. 116 at 8), that definition cannot be squared with the prosecution history. Defendants assert that if any distinguishable characteristic rendered a feature distinct, features A, C, D, and E would be distinct from each other. Defendants assert that the Applicant argued that these features were not distinct because they were overlapping:

> Disclosure 1 does not disclose exposing a portion of a first imaging layer to form a first feature and subsequently patterning a second imaging layer to form a second **distinct** feature. As previously discussed, disclosure 1 forms **overlapping** openings A, C, D, and E in order to incorporate three sets of patterns in two photomasking steps. Thus, Disclosure 1 teaches away from amended claim 1, because openings A, C, D, and E are **overlapping non-distinct** features.

(Dkt. No. 126 Ex. H '084 File History at 12–13) (emphasis added). Defendants assert that no reasonable person would read this statement and understand that the patentee meant to emphasize the shapes of openings A, C, D, and E. Instead, the patentee argued that overlapping features were non-distinct. Defendants further note that opening B and opening A are rectangles of the same size from a top-down perspective yet are nevertheless distinct, not because of their shape but because B is separate from and does not overlap the other openings. (Dkt. No. 126 at 22.)

Defendants further point to an interview with the examiner that occurred prior to the amendment that added "distinct." (Dkt. No. 126 Ex. H at 8.) Defendants assert that the Interview Summary states that the Applicant's amendment was meant to clarify the relationship between

A20

the claimed features. (*Id.*) The Applicant made two changes in this regard: applicant replaced the term "adjacent" with the term "distinct" and specified that the first and second features must be formed relatively closer to one another than is possible through a single exposure to radiation. (*Id.* at 10.) Defendants assert that "adjacent" is understood to mean immediately next to or abutting. Defendants assert that when coupled with the amendment to clarify the relationship between the features—i.e., that there must be a measurable distance between the two features— the substitution of the term "distinct" for the term "adjacent" makes clear that distinct means not in contact with.

As to the dependent claim 12 and claim differentiation arguments presented below by DSS, Defendants assert that prosecution history disclaimer rebuts the presumption of claim differentiation. (Dkt. No. 126 at 22–23) (citing *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 (Fed. Cir. 2013) and *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1345–46 (Fed. Cir. 2013) ("Claim differentiation is not a rigid rule and it cannot overcome a construction required by the prosecution history.").

DSS asserts that Defendants' position that "distinct" means features that do not overlap is contradicted by dependent claim 12 that adds the limitation that the features of independent claim 1 "do not overlap." DSS asserts that "overlap" and "distinct" are different inquires under the claims. DSS asserts that the claim language thus indicates that whether two features are "distinct" from each other is a different inquiry as to whether the features are spaced apart or overlapping. DSS asserts that the ordinary meaning of "distinct" means that two items are "distinguishable to the eye or mind as discrete." (Dkt. No. 116 at 8) (citing Ex. 4, Webster's Dictionary at DSS-001016).

DSS notes that in prosecution, some claims were amended to add the "distinct"

requirement (claim 1) and some claims were amended to state that the features "do not overlap" (added dependent claim 12). (Dkt. No. 116 Ex. 1 at DSS-0000126–32, 140–46.) DSS asserts that the inventor added these claim elements to overcome Disclosure 1 (that disclosed four openings (A, C, D and E) that are "overlapping non-distinct features"). (*Id.*) at DSS-0000129–130, and 143–144. DSS asserts that the inventor distinguished the reference on two grounds: first, that Disclosure 1 teaches overlapping features (a limitation added to dependent claim 12) and second, that Disclosure 1 discloses features that are non-distinct and as a result did not disclose distinct features (a limitation added to independent claim 1). (Dkt. No. 116 at 10.) DSS asserts that from a top view, openings A, C, and D are each subsumed within opening E and, thus, from a top-down view, those openings are part of the same geometric shape within E. DSS asserts that "distinct" must have some meaning and cannot be read out of the claims. DSS asserts that the ordinary meaning should apply.

DSS asserts that Defendants misread the prosecution history. DSS asserts that the Applicant added "distinct" in claim 1 and "overlapping" in claim 12. DSS asserts that the Applicant argued that Disclosure 1 had two deficiencies: "overlapping non-distinct" features. (Dkt. No. 116 Ex. 1 at 129–31.) DSS asserts that the Applicant did not argue that the features were "non-distinct" because they were "overlapping," but rather the Applicant highlighted two shortcomings. (Dkt. No. 116 at 12.)

Analysis

The parties do not dispute that the ordinary meaning of "distinct" does not mandate "non-overlapping." However, Defendants assert that the Applicant's prosecution arguments limited claim 1 to both "distinct" and "overlapping." Prosecution arguments by nature are often not clear. *Phillips*, 415 F.3d at 1317 (noting that the prosecution history represents an "ongoing

A22

negotiation" and "often lacks the clarity of the specification"). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc.,* 311 F.3d at 1388. Thus, statements will constitute disclaimer of scope only if they are "clear and unmistakable statements of disavowal." *See Cordis Corp.*, 339 F.3d at 1358. Here, such disclaimer or disavowal is not present. Moreover, when viewed in context of the entirety of the argument and accompanying claim amendments, the prosecution history tends to support the conclusion that "distinct" and "non-overlapping" are two different grounds Applicant separately argued and that "distinct" is not required to be "non-overlapping." At a minimum, the prosecution history provides no clarity that "distinct" was meant to mean "non-overlapping."

The parties agree that the relevant arguments are found in a September 24, 1996 Amendment After Final Action. (Dkt. No. 116 Ex. 1.) In that Amendment, the Applicant amended claim 1 to include among other things "having a second feature distinct from the first feature." In addition, a new application claim 25 (now issued claim 12) was added: "The lithography method of Claim 1, where the first and second features do not overlap." (*Id.* at 1–3.) The accompany argument to the claim amendments stated:

> Disclosure 1 does not disclose exposing a portion of a first imaging layer to form a first feature and subsequently patterning a second imaging layer to form a second distinct feature. As previously discussed, disclosure 1 forms overlapping openings A, C, D, and E in order to incorporate three sets of patterns in two photomasking steps. Thus, Disclosure 1 teaches away from amended claim 1, because openings A, C, D, and E are overlapping non-distinct features.

*Id.* at 4–5. Though Defendants assert that this paragraph equates distinct and non-overlapping, the Amendment as a whole does not make such an interpretation clear. The arguments could be read to refer in the first sentence to one ground of patentability (i.e., Disclosure 1 does not disclose "distinct" features). Then, the second sentence describes a second ground of

patentability (i.e., Disclosure 1 does not form overlapping openings). Though the passage does conclude with the phrase "overlapping non-distinct features," it would be plain error to not consider the Amendment as a whole. The claim amendments to which the arguments refer specifically added "distinct" to claim 1 and "do not overlap" to issued dependent claim 12. Considering the entirety of the Amendment, it is not clear that "distinct" is equated to "non-overlapping."

Though Defendants' characterize dependent claim 12 as an example where the tenet of claim differentiation is merely a rebuttable presumption, here the claim amendments provide context and scope to the very arguments at issue. Thus, the different usage of the terms in the claims provides a fuller context and understanding of the accompanying arguments. When considered in its entirety, the Amendment does not create a disavowal or disclaimer as to the meaning of "distinct."[5] The Court thus finds that the term "distinct" is used in its ordinary meaning to indicate that the features are distinguishable from each other. Accordingly, the Court construes

**"a second feature distinct from the first feature" to mean "a second feature distinguishable from the first feature."**

### 4. "stabilizing the first patterned layer"

| DSS's Construction | Defendant's Construction |
|---|---|
| No construction is necessary. Plain and ordinary meaning. | "subjecting the first patterned layer to a process to render the first patterned layer able |

---

[5] At the oral hearing, Defendants argued that absent the phrase "do not overlap," the claims would be invalid. Hearing Tr. at 38–39. Invalidity raises additional issues and does not necessarily mandate a particular construction. For example, page 5 of the Amendment included an argument that Disclosure 1 did not teach the relatively closer limitation of claim 1. Furthermore, arguments may exist as to whether in Disclosure 1, opening A—though overlapping with opening C—is or is not distinct under the ordinary meaning of distinct.

| Alternatively:

"subjecting the first imaging layer to a process that when completed results in a first patterned layer that (1) is able to withstand chemical transformation from any subsequent exposure to radiation, (2) may be subjected to solvents of the subsequent imaging layer, and (3) may be subjected to a subsequent developer with relatively minimal, if any dissolution" | to withstand subsequent lithographic processing steps, such as exposure to radiation, exposure to a solvent, or exposure to a developer" |
|---|---|

The differences between the parties' proposals focus on DSS's inclusion of the imaging layer being subjected to a process that results in the patterned layer being stable and whether the processes described should be described by the "or" verses "and" conjunction. At the oral hearing, the Court proposed a construction of "performing any process that renders a material able to withstand subsequent lithographic processing steps."

The Court's proposed construction conformed to the PTAB's construction for "stabilizing." (Dkt. No. 126 Ex. G at 7.) DSS agreed to the Court's construction. Hearing Tr. at 44. Defendants objected to the construction as lacking reference to the first pattern layer. In particular, Defendants noted that the PTAB merely construed "stabilizing" and that the term presented to the Court for consideration is "stabilizing the first patterned layer." Defendants asserted that thus the construction should include "first patterned layer." Hearing Tr. at 46–47. DSS agreed that the "material" in the Court's proposed construction was the "first patterned layer" and that DSS was amenable to change the Court's proposal to replace "material" with "first patterned layer." Hearing Tr. at 53–54. Defendants also agreed that at a minimum, the Court's proposal should replace "material" with "first patterned layer." Hearing Tr. at 55–56.

At the oral hearing, Defendants sought to further include "first patterned layer" in the construction twice, agreeing to the following construction: "performing any process on the first

pattern layer that renders the first pattern layer able to withstand subsequent lithographic processing steps." Hearing Tr. at 55–56. Presumably Defendants concerns relate to (1) the "patterned layer" dispute above with reference to whether the pattern layer includes portions and spaces of the imaging layer, and (2) DSS's inclusion in its original construction that the process is performed on the imaging layer and not the patterned layer. Defendants' first concern has been more properly resolved above with regard to the "patterned layer" terms. As to the second concern, DSS has acknowledged that "DSS agrees with the Defendants that the limitation is 'stabilizing the first patterned layer,' not the imaging layer." (Dkt. No. 130 at 8.) Thus, any remaining concerns raised by Defendants have been addressed. Accordingly, the Court construes

**"stabilizing the first patterned layer" to mean "performing any process that renders the first patterned layer able to withstand subsequent lithographic processing steps."**

5. **"the second patterned layer and the first patterned layer form a single patterned layer"**

| DSS's Construction | Defendant's Construction |
|---|---|
| No construction is necessary. Plain and ordinary meaning.<br><br>Alternatively:<br><br>"single layer of patterned features, even if the patterned features are from more than one imaging layer" | Samsung:<br>"the first patterned layer remains with the second patterned layer thereby forming a single patterned layer"<br><br>TSMC and NEC:<br>No construction necessary. Plain and ordinary meaning.<br><br>Alternatively, same as Samsung. |

In the briefing, the parties' dispute focused upon whether the first and second patterned layers can be etched underlying layers and, therefore, whether the "single patterned layer" can include patterned photoresist imaging layers and etched underlying layers. That dispute is really a dispute regarding the meaning of "patterning the [first/second] imaging layer" and

"[first/second] patterned layer." The "patterning" and "patterned layer" terms construed elsewhere herein are the more appropriate terms under which to resolve the dispute.

At the oral hearing, Samsung raised the concern that DSS's alternative construction creates the implication that the "single patterned layer" may be formed from only one layer. In particular, Samsung expressed concerns that DSS's language "even if the patterned features are from more than one imaging layer" implies that only one layer could be utilized to form the "single patterned layer." Hearing Tr. at 56–57. Samsung's concerns are well founded. The claim language clearly requires that two layers form the single patterned layer: "the second patterned layer and the first patterned layer form a single patterned layer." This is plain from the claim language itself and can be understood without any further construction and any assertion by DSS otherwise is expressly rejected herein.

As to what are the "second patterned layer" and the "first patterned layer," the constructions provided above define those terms ("a layer containing the portions and spaces of the [first/second] imaging layer that remain after the [first/second] patterning step"). Thus, in the term "the second patterned layer and the first patterned layer form a single patterned layer," no further construction of the first/second "patterned layer" is needed. What remains of the disputed claim term needs no further construction. Accordingly, the Court finds

**"the second patterned layer and the first patterned layer form a single pattern layer" requires no further construction beyond the constructions provided for the "first/second patterned layer" terms.**

**6.** **"wherein the first and second features which are formed relatively closer to one another than is possible through a single exposure to radiation"**

| DSS's Construction | Defendant's Construction |
|---|---|
| No construction is necessary. Plain and ordinary meaning.<br><br><br>Alternatively,<br><br>"wherein the first and second features are formed closer to one another than is possible through a single exposure to radiation" | Indefinite |

    The Defendants assert that the term in question is indefinite. In their response brief and at the oral hearing, Defendants asserted that it is uncertain as to "what is possible through a single exposure" because "what is possible" may depend upon a number of lithography process techniques and the resolution for a "single exposure" may change depending upon what techniques are used.

<u>Positions of the Parties</u>

    DSS asserts that the claim recites two patterning steps, each involving exposing the semiconductor to radiation. 1:19–36, 3:30–4:30, 5:57–7:14. DSS asserts that the '084 Patent teaches multiple examples of radiation: UV, DUV, vacuum UV, x-ray, e-beam, and ion beam radiation. 3:42–47, 4:44–64, 7:23–35, and 12:21–28. DSS cites to its expert declaration to assert that regardless of the type of radiation used, for those skilled in the art, the resolution limit was a well-known attribute of every lithography tool in December 1994. (Dkt. No. 116 at 19) (citing Ex. 9 Mack Declaration at ¶¶ 20–22 and Ex. 8 Mack Deposition at 172:7–173:5).

    DSS also notes that TSMC's expert testified that lithography equipment makers would supply the resolution limit and that the formula for calculating such a limit was well known to

depend on a process constant, the wavelength of the radiation, and the numerical aperture. (Dkt. No. 116 at 19) (citing Blanchard Deposition at 104:7–105:2, and 168:23–170:9). DSS asserts that its expert testified similarly and further stated that for such lithography tools, there was a well-known physical limit on the resolution of repeating patterns. (Dkt. No. 116 at 19.)

DSS asserts that the resolution limits for lithographic tools defines the distance that is "possible through a single exposure to radiation." DSS asserts that it is improper to maintain that some other unspecified technique would provide the baseline distance. DSS asserts that the claim calls out two patterning steps and that the patent ties the resolution limit for the radiation used in those imaging layers to what is "possible through a single exposure." DSS points to the specification passage: "features for the resulting single patterned layer . . . may be formed relatively closer to one another as the resolution of the lens for the lithographic patterning of an imaging layer through a single exposure to radiation does not limit the pitch for adjacent features of the single patterned layer." 12:29–35.

DSS notes that even TSMC's expert testified that for the distance to be "relatively closer to one another than is possible through a single exposure," the distance must be "smaller than the resolution distance of a system that is being used to perform the patterning steps." (Dkt. No. 116 at 20–21) (citing (Dkt. No. 116 Ex. 7 Blanchard Decl. at ¶ 24)). DSS cites to its expert to support its position that there is no basis in the patent or otherwise to compare the distance of the features to a distance achievable by some third system to determine "what is possible." (Dkt. No. 116 at 21.) DSS cites to its expert for asserting that one skilled in the art could access with reasonable certainty whether the limitation was met and that the distances could be readily measured, calculated, or determined for every lithography tool. (Dkt. No. 116 at 21–22.) As to Defendants' objections that the claims are not limited to particular lithography techniques, DSS asserts that

those types of limitations are immaterial to determining the bounds of the claim given the clear claim language and the examples of lithography techniques disclosed in the specification. (Dkt. No. 116 at 22.)

DSS also asserts that the prosecution history shows that the term is definite. DSS notes that the term was subject to discussion with the examiner and that the examiner referenced the term in the Reasons For Allowance, counseling that the examiner understood the term. (Dkt. No. 116 at 23.) DSS notes that the limitation in question was argued as a point of distinction over the cited prior art. DSS also notes that in such arguments, the Applicant cited to the specification at 11:65–13:4 and stated "given that the first and second features are formed relatively closer to one another than is possible in a single exposure to radiation, the density with which semiconductor devices may be fabricated may be increased." (Dkt. No. 116 at 24.) DSS asserts that the examiner then allowed the claims specifically noting:

> Disclosure 2 forms two distinct patterns in two different layers but the patterns are not formed closer to one another than possible in a single exposure. Rather images are forme[d] []in one layer using one method which produces a certain resolution and then a second pattern is formed in the second layer where resolution is less critical.

(Dkt. No. 116 Ex. 1 at DSS–000152–53.)

DSS asserts that Defendants also misread the claims as requiring a reference to what is possible through a single exposure without reference to the lithography system that is employed. DSS asserts that Defendants' expert Blanchard rejected that position by testifying that "relatively closer" is met when the distance is "smaller than the resolution distance of a system that is being used to perform the patterning steps." (Dkt. No. 116 Ex. 7 Blanchard Decl. at ¶ 24.) DSS also cites to its own expert as explaining that the intrinsic record ties the single exposure limit for the

systems used in the claimed patterning steps to what is "possible through a single exposure to radiation." (Dkt. No. 130 at 10.)

Defendants assert it is not possible to determine whether two features are closer than otherwise possible. Defendants assert that forming features that are "closer" than what is possible through a single exposure depends on several factors in addition to the resolution of the lithography system including any image correction techniques utilized, mask techniques (e.g., phase shifting masks), and the transmission medium through which the radiation passes. Thus, what is possible through a single exposure to radiation is not a fixed target because the minimum resolution for a single exposure changes. (Dkt. No. 126 at 27–28) (citing (Dkt. No. 126 Ex. J Blanchard Depo at 164–165)). At the oral hearing, Defendants introduced an article published by DSS's expert in which DSS's expert stated that "the resolution limit of optical lithography is not a simple function" and is a function of various process characteristics. (Dkt. No. 137 Ex. A at 3–4); Hearing Tr. at 69–70.

Defendants assert that where a claim requires a comparison to some numerical limitation and there are multiple methods for measuring the number, the claim is indefinite for failing to disclose which method to use. (Dkt. No. 126 at 28) (citing *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008)). Defendants assert that to determine the "relatively closer" limitation, the person skilled in the art must choose the system and all the correction and improvement techniques to determine what is "possible" for a single exposure. Defendants assert that the specification does not instruct what system or techniques to use. (Dkt. No. 126 at 28.)

Defendants note that the claim states that the comparison point is "what is possible through a single exposure." Defendants assert that the claim does not state "what is possible

using a given system under a given set of conditions." Defendants assert that DSS is in essence arguing that the claim recites "for a given set of lithography tools." Defendants assert that DSS is asking the Court to change step (b) to "patterning the first imaging layer **using a first lithography system**," and step (e) to "patterning the second imaging layer **using a second lithography system** . . . relatively closer to one another than is possible through a single exposure to radiation **using the first or second lithography systems**" (added material in bold). Defendants assert the claim construction must focus on the claims themselves and the plain language describes a comparison to what is possible through a single exposure to radiation without references to the limitations of the lithography system that is employed. Defendants further assert that nothing in the specification teaches that the comparison is supposed to be with the lithography system used in the first or second patterning steps. (Dkt. No. 126 at 30.)

Analysis

The analysis and evidence cited by DSS is supported in both the intrinsic and extrinsic evidence. In context of the claims and the specification, it is clear to a reasonable certainty that the term "that is possible through a single exposure to radiation" is with reference to the exposures of the first and second patterning steps: "patterning the first imaging layer" and "patterning the second imaging layer." The claims teach this implicitly by calling out two individual patterning steps (that the parties agree each require "exposing an imaging layer to radiation") and then concluding with the description that the features are formed "closer to one another than is possible through a single exposure to radiation." This is also confirmed by the specification that repeatedly in all embodiments (e.g., Figure 1 embodiment, Figure 6 embodiment, and Figure 12 embodiment) describes a two-exposure process that provides closer

features than would result from one of the two exposure steps. Further, the specification provides the conclusion:

> For the methods of FIGS. 1, 6, and 12, features for the resulting single patterned layer, such as the patterned layer illustrated in FIGS. 5, 11 and 16 respectively may be formed relatively closer to one another as the resolution of the lens for the lithographic patterning of an imaging layer through a single exposure to radiation does not limit the pitch for adjacent features of the single patterned layer. As these features maybe be formed relatively closer to one another, the density with which semiconductor devices may be fabricated may be increased. . . .

12:29–35. It is clear that the resolution of the system for the patterning of the image layers shown in the figures is the relevant resolution, not some abstract, unknown, and undefined system. In context of the disclosure, the impact of surrounding process variables does not change the fact that the disclosed techniques, and what is claimed, allow for relatively closer features than could be provided in a single patterning step. The prosecution history, in which the term in question was a point of focus, further supports that the term was understandable to one skilled in the art.

Defendants make many assertions that what is possible through a single exposure depends on several factors in addition to the resolution of the lithography lens system including any image correction techniques utilized, mask techniques (e.g., phase shifting masks), and the transmission medium through which the radiation passes. That these factors, in addition to lens resolution, may impact "what is possible," does not seem to be disputed. In context of the claims, "what is possible" is with reference to the two individual patterning steps.

It is instructive to note that even Defendants' extrinsic evidence of one skilled in the art emphasizes that the impact of the surrounding process conditions would not render the meaning indefinite. In fact, TSMC's expert Blanchard states in his declaration:

> When describing a conventional photolithography system using a single exposure to radiation, the '084 patent states that "the minimum resolution capability of the lithography process determines the minimal pitch with which features for a patterned layer may be printed." '084 patent at 1:31–33. **Accordingly, it is my opinion that one of ordinary skill would understand**

> **that "wherein the first and second features which are formed relatively closer to one another than is possible through a single exposure to radiation" means that the features must be a distance apart that is smaller than the resolution distance of a system that is being used to perform the patterning steps.** To one of ordinary skill, this represents the maximum distance between features that would be considered to be "closer" than is possible through a single exposure to radiation. But the claim and the specification fail to identify the system that is being used for the first patterning step, the system that is being used for the second patterning step, and whether they are the same system.

(Dkt. No. 116 Ex. 7 Blanchard Dec at ¶ 24) (emphasis added). It is instructive that Blanchard acknowledges that one skilled in the art would understand that the resolution of the system being used to perform the patterning steps is what is relevant. Such an understanding conforms to DSS's expert's statements. (Dkt. No. 116 Ex. 9 at 4–6); (Dkt. No. 116 Ex. 8 at 133–34, 135–136, and169–173) Further, it is instructive that Blanchard does not state that one skilled in the art would not understand what system to consider (i.e., the systems of the first and second patterning steps). Rather, Blanchard merely states that the claims and specification do not identify the particular system that is being used for the first and second patterning steps. Such an identification of the particular system (e.g., lens, wavelength, photoresist, and other system variables) is not, however, required to render the claim definite to a reasonable certainty.

The overall context of the claims, specification, and prosecution history make clear that the "single exposure" is not an exposure with some unknown, abstract system. Rather, what is relevant is the lithography processes used for the first and second patterning steps. Further, the extrinsic evidence of one skilled in the art supports this conclusion. In context of the claims, specification, prosecution history and the understandings of those skilled in the art, the term is reasonably certain and does not require additional construction. Accordingly, the Court finds that

**"wherein the first and second features which are formed relatively closer to one another than is possible through a single exposure to radiation" is definite and has its plain and ordinary meaning requiring no further construction.**

## CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the '084 patent.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 8th day of April, 2015.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

US005652084A

# United States Patent [19]

## Cleeves

[11] **Patent Number:** 5,652,084

[45] **Date of Patent:** Jul. 29, 1997

[54] **METHOD FOR REDUCED PITCH LITHOGRAPHY**

[75] Inventor: **James M. Cleeves**, Redwood City, Calif.

[73] Assignee: **Cypress Semiconductor Corporation**, Calif.

[21] Appl. No.: **740,145**

[22] Filed: **Oct. 22, 1996**

### Related U.S. Application Data

[63] Continuation of Ser. No. 361,595, Dec. 22, 1994, abandoned.

[51] Int. Cl.$^6$ .................................................... G03F 7/20
[52] U.S. Cl. ......................... 430/315; 430/313; 430/328; 430/330
[58] Field of Search ..................................... 430/311, 313, 430/315, 324, 328, 330

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,548,688 | 10/1985 | Matthews | 430/325 |
| 4,775,609 | 10/1988 | McFarland | 430/325 |
| 4,814,243 | 3/1989 | Ziger | 430/30 |
| 4,826,756 | 5/1989 | Orvek | 430/328 |
| 4,859,573 | 8/1989 | Maheras et al. | 430/326 |
| 4,904,866 | 2/1990 | Collins | 250/492.2 |
| 4,908,656 | 3/1990 | Suwa et al. | 355/53 |
| 4,931,351 | 6/1990 | McColgin | 430/323 |
| 4,985,374 | 1/1991 | Tsuji et al. | 430/229 |
| 5,158,910 | 10/1992 | Cooper et al. | 437/195 |
| 5,219,787 | 6/1993 | Carey et al. | 437/187 |
| 5,270,236 | 12/1993 | Rosner | 437/48 |
| 5,300,403 | 4/1994 | Angelopolus | 430/325 |
| 5,319,247 | 6/1994 | Matsuura | 257/760 |
| 5,320,932 | 6/1994 | Haraguchi et al. | 430/312 |
| 5,352,630 | 10/1994 | Kim et al. | 437/195 |

#### OTHER PUBLICATIONS

Fukase, et al, "A Margin–Free Contact Process Using An Al$_2$O$_3$ Etch–Stop Layer For High Density Devices", IEDM, Apr. 1992, pp. 837–840.

Ueno, et al., "A High Quarter–Micron Planarized Interconnection Technology with Self–Aligned Plug", IEDM, Apr. 1992, pp. 305–308.

Kusters, et al., "A High Density 4Mbit dRAM Process Using A Fully Overlapping Bitline Contact (FoBIC) Trench Cell", 1987 *Symposium on VLSI Technology Digest of Technical Papers*, May 18–21, 1987/Karuizawa, pp. 93–94.

Kakumu, et al., "PASPAC (Planarized Al/Silicide/Poly Si with Self Aligned Contact) with Low Contact Resistance and High Reliability in CMOS LSIs", 1987 *Symposium on VLSI Technology Digest of Technical Papers*, May 18–21, 1987/Karuizawa, pp. 77–78.

Kenny, et al., "A Buried–Plate Trench Cell for a 64–Mb DRAM", 1992 *Symposium on VLSI Technology Digest of Technical Papers*, Apr. 1992, pp. 14–15.

Subbanna, et al., "A Novel Borderless Contact/Interconnect Technology Using Aluminum Oxide Etch Stop for High Performance SRAM and Logic", Dec. 1993, pp. 441–444.

(List continued on next page.)

*Primary Examiner*—Kathleen Duda
*Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman, LLP

[57] **ABSTRACT**

A lithographic patterning process uses multiple exposures to provide for relatively reduced pitch for features of a single patterned layer. A first imaging layer is exposed to radiation in accordance with a first pattern and developed. The resulting patterned layer is stabilized. A second imaging layer is subsequently formed to surround the first patterned layer, exposed to radiation in accordance with a second pattern, and developed to form a second patterned layer. As the first patterned layer has been stabilized, the first patterned layer remains with the second patterned layer to produce a single patterned layer. For another embodiment, a single imaging layer is patterned by exposure to radiation in accordance with two separate patterns. An exposed portion of the imaging layer is suitably stabilized to withstand subsequent lithographic process steps.

**16 Claims, 10 Drawing Sheets**



100 — FORM FIRST IMAGING LAYER

110 — PATTERN FIRST IMAGING LAYER IN ACCORDANCE WITH FIRST PATTERN

120 — STABILIZE FIRST PATTERNED LAYER

130 — FORM SECOND IMAGING LAYER

140 — PATTERN SECOND IMAGING LAYER IN ACCORDANCE WITH SECOND PATTERN

**5,652,084**

Page 2

## OTHER PUBLICATIONS

Kusters, et al., "A Stacked Capacitor Cell with a Fully Self–Aligned Contact Process for High–Density Dynamic Random Access Memories", *Journal of the Electrochemical Society*, vol. 139, No. 8, Aug. 1992, pp. 2318–2321.

"Method for Forming Via Hole Formation", *IBM Technical Disclosure Bulletin*, vol. 34, No. 10A, Mar. 1992, pp. 219–220.

"Self–Aligned, Borderless Polysilicon Contacts Using Polysilicon Pillars", *IBM Technical Disclosure Bulletin*, vol. 35, No. 2, Jul. 1992, pp. 480–483.

S. Wolf, Ph.D., et al., "Silicon Processing for the VLSI Era, vol. I: Process Technology", *Lithography I: Optical Resist Materials and Process Technology*, 1986, pp. 453–454.

S. Wolf, Ph.D., "Silicon Processing for the VLSI Era, vol. 2: Process Integration", *Multilevel–Interconnect Technology for VLSI & ULSI*, 1992, pp. 222–237.

"Method to Incorporate Three Sets of Pattern Information in Two Photomasking Steps," *IBM Technical Disclosure Bulletin*, vol. 32, No. 8A, pp. 218–219 (Jan. 1990).

"Dual–Image Resist for Single–Exposure Self–Aligned Processing," *IBM Technical Disclosure Bulletin*, vol. 33, No. 2, pp. 447–449 (Jul. 1990).

"Complementary Selective Writing by Direct–Write E–Beam/Optical Lithography Using Mixed Positive and Negative Resist," *IBM Technical Disclosure Bulletin*, vol. 33, No. 3A, pp. 62–63 (Aug. 1990).

"Sub–Micron Channel Length CMOS Technology," *IBM Technical Disclosure Bulletin*, vol. 33, No. 4, pp. 227–232 (Sep. 1990).

"Multilayer Circuit Fabrication Using Double Exposure of Positive Resist," *IBM Technical Disclosure Bulletin*, vol. 36, No. 10, pp. 423–424 (Oct. 1993).

Wolf, S., et al., *Silicon Processing for the VLSI Era, vol. 1: Process Technology*, Lattice Press, Sunset Beach, California, pp. 407–458 (1986).



100 — FORM FIRST IMAGING LAYER

110 — PATTERN FIRST IMAGING LAYER IN ACCORDANCE WITH FIRST PATTERN

120 — STABILIZE FIRST PATTERNED LAYER

130 — FORM SECOND IMAGING LAYER

140 — PATTERN SECOND IMAGING LAYER IN ACCORDANCE WITH SECOND PATTERN

Fig.1



Fig.2



Fig.3

**U.S. Patent**        Jul. 29, 1997        Sheet 3 of 10        5,652,084



Fig4



Fig.5

A53



300 — FORM IMAGING LAYER

310 — EXPOSE IMAGING LAYER IN ACCORDANCE WITH FIRST PATTERN

320 — STABILIZE EXPOSED PORTION OF IMAGING LAYER

330 — EXPOSE IMAGING LAYER IN ACCORDANCE WITH SECOND PATTERN

340 — STABILIZE EXPOSED PORTION OF IMAGING LAYER

350 — DEVELOP IMAGING LAYER

Fig.6

A54



421   422   423   420   410   400

Fig7



420   432   420   410   400

Fig.8

A55



Fig9



Fig.10



Fig.11



500 — FORM IMAGING LAYER

510 — EXPOSE IMAGING LAYER IN ACCORDANCE WITH FIRST PATTERN

520 — STABILIZE EXPOSED PORTION OF IMAGING LAYER

530 — EXPOSE IMAGING LAYER IN ACCORDANCE WITH SECOND PATTERN

540 — DEVELOP IMAGING LAYER

Fig.12

A58



Fig13



Fig.14



Fig15



Fig.16

1

# METHOD FOR REDUCED PITCH LITHOGRAPHY

This is a continuation of application Ser. No. 08/361,595, filed Dec. 22, 1994, now abandoned.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to the field of semiconductor fabrication. More particularly, the present invention relates to the field of lithography processing for semiconductor fabrication.

### 2. Description of the Related Art

Lithography processes are typically used for semiconductor fabrication, for example to form a mask over a layer to be patterned in accordance with various functional and/or design requirements for fabricating a desired semiconductor device.

For a typical lithography process, photoresist is deposited over the layer to be patterned and is exposed to ultraviolet radiation through a mask that defines the pattern to be formed in the photoresist. The photoresist is then developed to form a patterned photoresist layer over the underlying layer to be patterned. Those portions of the underlying layer that are not covered by photoresist may then be etched using suitable etch techniques and chemistries. The pattern in the photoresist is thus replicated in the underlying layer.

Typical lithography processes, however, limit the size and density with which semiconductor devices may be fabricated. For example, the minimum resolution capability of the lithography process determines the minimal pitch with which features for a patterned layer may be printed. The minimum lithographic resolution for a patterning process may depend, for example, on the lens used in exposing photoresist to radiation through the mask.

## BRIEF SUMMARY AND OBJECTS OF THE INVENTION

One object of the present invention is to provide for a relatively reduced pitch for features of a patterned layer.

Another object of the present invention is to provide for the fabrication of relatively denser semiconductor devices.

Another object of the present invention is to provide for the fabrication of relatively smaller-sized semiconductor devices.

A lithography method for semiconductor fabrication using a semiconductor wafer is described. For the lithography method, a first imaging layer is formed over the semiconductor wafer. The first imaging layer is patterned in accordance with a first pattern to form a first patterned layer. The first patterned layer is stabilized. A second imaging layer is formed over the first patterned layer such that the first patterned layer is surrounded by the second imaging layer. The second imaging layer is patterned in accordance with a second pattern to form a second patterned layer.

Another lithography method for semiconductor fabrication using a semiconductor wafer is also described. For the lithography method, an imaging layer is formed over the semiconductor wafer. A portion of the imaging layer is exposed to radiation in accordance with a first pattern. The exposed portion of the imaging layer is stabilized. The imaging layer is patterned in accordance with a second pattern to form a patterned layer.

Other objects, features, and advantages of the present invention will be apparent from the accompanying drawings and from the detailed description that follows below.

2

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example and not limitation in the figures of the accompanying drawings, in which like references indicate similar elements and in which:

FIG. 1 illustrates, in flow diagram form, one lithography method for semiconductor fabrication;

FIG. 2 illustrates a cross-sectional view of a semiconductor wafer having a first imaging layer being exposed to radiation through a first mask;

FIG. 3 illustrates a cross-sectional view of the semiconductor wafer of FIG. 2 after the first imaging layer has been developed;

FIG. 4 illustrates a cross-sectional view of the semiconductor wafer of FIG. 3 where a second imaging layer is formed over the wafer and is being exposed to radiation through a second mask;

FIG. 5 illustrates a cross-sectional view of the semiconductor wafer of FIG. 4 after the second imaging layer has been developed;

FIG. 6 illustrates, in flow diagram form, another lithography method for semiconductor fabrication;

FIG. 7 illustrates a cross-sectional view of a semiconductor wafer having an imaging layer being exposed to radiation through a first mask;

FIG. 8 illustrates a cross-sectional view of the semiconductor wafer of FIG. 7 after an exposed portion of the imaging layer has been stabilized;

FIG. 9 illustrates a cross-sectional view of the semiconductor wafer of FIG. 8 where the imaging layer is exposed to radiation through a second mask;

FIG. 10 illustrates a cross-sectional view of the semiconductor wafer of FIG. 9 after an exposed portion of the imaging layer has been stabilized;

FIG. 11 illustrates a cross-sectional view of the semiconductor wafer of FIG. 10 after the imaging layer has been developed;

FIG. 12 illustrates, in flow diagram form, another lithography method for semiconductor fabrication;

FIG. 13 illustrates a cross-sectional view of a semiconductor wafer having an imaging layer being exposed to radiation through a first mask;

FIG. 14 illustrates a cross-sectional view of the semiconductor wafer of FIG. 13 after an exposed portion of the imaging layer has been stabilized;

FIG. 15 illustrates a cross-sectional view of the semiconductor wafer of FIG. 14 where the imaging layer is exposed to radiation through a second mask; and

FIG. 16 illustrates a cross-sectional view of the semiconductor wafer of FIG. 15 after the imaging layer has been developed.

## DETAILED DESCRIPTION

The following detailed description sets forth an embodiment or embodiments in accordance with the present invention for method for reduced pitch lithography. In the following description, details are set forth such as specific materials, thicknesses, parameters, etc., in order to provide a thorough understanding of the present invention. It will be evident, however, that the present invention may be practiced without these details. In other instances, well-known process steps, equipment, etc., have not been described in particular detail so as not to obscure the present invention.

5,652,084

3

FIG. 1 illustrates, in flow diagram form, one lithography method for semiconductor fabrication. For one embodiment, the method of FIG. 1 may be used for semiconductor fabrication using a semiconductor wafer, such as the semiconductor wafer illustrated in FIGS. 2, 3, 4, and 5 for example.

For the method of FIG. 1, a semiconductor substrate 200 is provided as illustrated in FIG. 2. Substrate 200 may include any suitable semiconductor material, including silicon (Si) for example.

As illustrated in FIG. 2, a layer 210 may be formed over substrate 200. Layer 210 may include any suitable material and may be formed to any suitable thickness using any suitable technique depending, for example, on the purpose of layer 210 in fabricating a desired semiconductor device. Layer 210 may include one or more layers, including device, dielectric, contact, interconnect, and/or via layers for example. Layer 210 is not necessary to practice the method of FIG. 1.

As one example, layer 210 may include a layer that is to be patterned in accordance with a subsequent mask layer formed over layer 210. Layer 210 may include a dielectric layer, including silicon dioxide ($SiO_2$) for example, that is to be patterned for a contact or interconnect layer, for example. Layer 210 may also include a layer over which a via or interconnect layer is to be formed. Layer 210 may have exposed regions to be electrically coupled by vias or interconnects formed in a subsequent layer.

For step 100 of FIG. 1, a first imaging layer is formed over the semiconductor wafer. As illustrated in FIG. 2, an imaging layer 220 is formed over layer 210. Imaging layer 220 may include any suitable material formed to any suitable thickness using any suitable technique.

For one embodiment, imaging layer 220 may include a suitable positive photoresist, for example, that has been spun-on to a thickness of approximately 10,000 Angstroms (Å). Other suitable thicknesses of positive photoresist, for example in the range of approximately 1,000 Å to approximately 30,000 Å, may also be used. For other embodiments, imaging layer 220 may include a suitable negative photoresist, a suitable radiation-sensitive polyimide, or other suitable radiation-sensitive materials for example. For this detailed description, the term radiation encompasses any energy radiated in the form of waves or particles. The term radiation may include ultraviolet (UV) light, x-ray radiation, electron beam or e-beam radiation, vacuum UV radiation, or ion beam radiation for example.

For step 110 of FIG. 1, the first imaging layer is patterned in accordance with a first pattern to form a first patterned layer. Any suitable lithographic patterning technique may be used and may depend, for example, on the material used for imaging layer 220.

Where a positive-tone imaging material is used for imaging layer 220, such as a suitable positive photoresist or a suitable positive-tone radiation-sensitive polyimide for example, imaging layer 220 may be exposed to radiation through a first mask having opaque feature 222 and clear features 221 and 223 as illustrated in FIG. 2. The first mask may include any suitable pattern of opaque and clear features that may depend, for example, on the desired pattern to be formed in imaging layer 220. For this detailed description, the term mask encompasses a reticle, for example, for use in a step-and-repeat projection system.

Imaging layer 220 may be exposed through the first mask using any suitable form of radiation. The radiation serves to render soluble in a suitable developer that portion of imag-

4

ing layer 220 exposed to radiation through clear features 221 and 223. That portion of imaging layer 220 that has not been exposed to radiation remains relatively insoluble in the developer.

Imaging layer 220 may then be developed in a suitable developer to form a first patterned layer 232. As illustrated in FIG. 3, that portion of imaging layer 220 exposed to radiation through the first mask is soluble in the developer and is thus dissolved from imaging layer 220. That portion of imaging layer 220 that has not been exposed to radiation is relatively insoluble in the developer, and thus remains to form first patterned layer 232.

For other embodiments where a suitable negative-tone imaging material is used for imaging layer 220, the negative-tone imaging layer 220 may be exposed to any suitable form of radiation through a suitable negative-tone mask having opaque features 221 and 223 and a clear feature 222, for example. Negative-tone imaging materials may include a suitable negative photoresist, a suitable positive photoresist that is to be subjected to an image reversal process, or a suitable negative-tone radiation-sensitive polyimide for example. The negative-tone imaging layer 220 may be developed in a suitable developer to form a first patterned layer 232 as illustrated in FIG. 3. That portion of imaging layer 220 exposed to radiation through the first mask is relatively insoluble in the developer and thus remains to form first patterned layer 232. That portion of imaging layer 220 that has not been exposed to radiation is soluble in the developer and is thus dissolved from imaging layer 220.

For step 120 of FIG. 1, the first patterned layer is stabilized. Any suitable stabilization technique may be used and may depend, for example, on the material used to form first patterned layer 232.

First patterned layer 232 may be stabilized to withstand subsequent lithographic processing steps. First patterned layer 232 may be stabilized to withstand chemical transformation as a result of any subsequent exposure to radiation, for example. First patterned layer 232 may also be stabilized to withstand dissolution by solvents during a subsequent spin-on of photoresist, for example. First patterned layer 232 may further be stabilized to withstand dissolution by a subsequent developer, for example.

Where a positive photoresist is used to form first patterned layer 232, a suitable deep ultraviolet (DUV) stabilization technique may be used to stabilize first patterned layer 232. For one embodiment, first patterned layer 232 may be irradiated with a DUV light source having a wavelength in the range of approximately 200 nanometers to approximately 400 nanometers, for example, and simultaneously heated with a temperature ramped up to approximately 230 degrees Celsius, for example, over an approximately 60 second period of time, for example. First patterned layer 232 may be irradiated at that peak temperature for approximately 5 seconds, for example. For other embodiments, first patterned layer 232 may be irradiated with a UV light source having other suitable wavelengths, for example in the range of approximately 100 nanometers to approximately 500 nanometers, and may be heated to other suitable peak temperatures, for example in the range of approximately 120 degrees Celsius to approximately 250 degrees Celsius. First patterned layer 232 may be irradiated at a peak temperature for any suitable length of time, for example in the range of approximately 2 seconds to approximately 60 seconds.

Where first patterned layer 232 includes a positive photoresist, first patterned layer 232 may be stabilized using other suitable techniques. As one example, a pirst technique

5

may be used to form a carbon fluorine ($CF_4$) skin over first patterned layer 232 by exposing the photoresist to a fluorine ambient. A silylation technique may also be used to form a silicon dioxide ($SiO_2$) skin over first patterned layer 232. For other embodiments, other suitable techniques may be used to form a hardened skin over first patterned layer 232 to stabilize first patterned layer 232. For still other embodiments, the positive photoresist of first patterned layer 232 may be subjected to a suitable heat treatment or to a suitable radiation treatment to stabilize first patterned layer 232.

Stabilizing positive photoresist for first patterned layer 232 serves to neutralize photoactive compounds in the photoresist of first patterned layer 232. Upon any subsequent exposure to radiation then, first patterned layer 232 undergoes minimal, if any, chemical transformation. The photoresist of first patterned layer 232 may also be subjected to a subsequent spin-on of photoresist with relatively minimal, if any, dissolution by solvents of the subsequent photoresist layer. The photoresist of first patterned layer 232 may further be subjected to a subsequent development with relatively minimal, if any, dissolution by a developer.

For other embodiments where a negative photoresist is used to form first patterned layer 232, first patterned layer 232 may be stabilized while first patterned layer 232 is being patterned. Because first patterned layer 232 is formed from that portion of negative photoresist that has been exposed to radiation and rendered relatively insoluble in a developer, the negative photoresist of first patterned layer 232 is able to withstand chemical transformation from any subsequent exposure to radiation and is able to withstand dissolution by a subsequent developer. The photoresist of first patterned layer 232, however, may be subjected to a suitable stabilization technique as necessary to withstand dissolution by solvents during a subsequent spin-on of photoresist, for example. A suitable DUV stabilization technique, a suitable first technique, a suitable silylation technique, a suitable heat treatment, or a suitable radiation treatment, for example, may be used to stabilize the negative photoresist of first patterned layer 232.

For still other embodiments where a negative-tone radiation-sensitive polyimide is used to form first patterned layer 232, first patterned layer 232 may be stabilized while first patterned layer 232 is being patterned. Because first patterned layer 232 is formed from that portion of polyimide that has been exposed to radiation and rendered relatively insoluble in a developer, the polyimide of first patterned layer 232 is able to withstand chemical transformation from any subsequent exposure to radiation and is able to withstand dissolution by a subsequent developer. The polyimide of first patterned layer 232, however, may be subjected to a suitable stabilization technique, such as by heat treatment for final curing for example, as necessary to withstand dissolution by the formation of a subsequent layer over first patterned layer 232, for example.

For step 130 of FIG. 1, a second imaging layer is formed over the semiconductor wafer. As illustrated in FIG. 4, an imaging layer 240 is formed over first patterned layer 232 and over layer 210. Imaging layer 240 is formed to surround first patterned layer 232 on the sidewalls of first patterned layer 232. Imaging layer 240 may optionally be formed to cover the top of first patterned layer 232 as well. Imaging layer 240 may include any suitable material formed to any suitable thickness using any suitable technique.

For one embodiment, imaging layer 240 may include a suitable positive photoresist, for example, that has been

6

spun-on to a thickness of approximately 10,000 Å. Other suitable thicknesses of positive photoresist, for example thicknesses approximately equal to or greater than that of first patterned layer 232, may also be used. Imaging layer 240 may include other suitable materials, including a suitable negative photoresist, a suitable radiation-sensitive polyimide, or other suitable radiation-sensitive materials for example. For embodiments where photoresist is spun-on to form imaging layer 240, first patterned layer 232 has preferably been stabilized to withstand dissolution by solvents during spin-on of the photoresist for imaging layer 240.

For step 140 of FIG. 1, the second imaging layer is patterned in accordance with a second pattern to form a second patterned layer. Any suitable lithographic patterning technique may be used and may depend, for example, on the material used for imaging layer 240.

Where a positive-tone imaging material is used for imaging layer 240, such as a suitable positive photoresist or a suitable positive-tone radiation-sensitive polyimide for example, imaging layer 240 may be exposed to radiation through a second mask having opaque features 242 and 244 and clear features 241, 243, and 245 as illustrated in FIG. 4. The second mask may include any suitable pattern of opaque and clear features that may depend, for example, on the desired pattern to be formed in imaging layer 240.

Imaging layer 240 may be exposed through the second mask using any suitable form of radiation. The radiation serves to render soluble in a suitable developer that portion of imaging layer 240 exposed to radiation through clear features 241, 243, and 245. That portion of imaging layer 240 that has not been exposed to radiation remains relatively insoluble in the developer. As first patterned layer 232 has been stabilized, first patterned layer 232 undergoes minimal, if any, chemical transformation as a result of any exposure to radiation for patterning imaging layer 240.

Preferably, first patterned layer 232 does not affect in a material manner the lithographic patterning of imaging layer 240. That is, first patterned layer 232 preferably does not materially affect the desired patterning of imaging layer 240, for example, by reflecting any radiation. First patterned layer 232 may be treated using any suitable processing technique, such as bleaching or baking for example, as necessary to avoid or minimize adverse effects by first patterned layer 232 in patterning imaging layer 240. For one embodiment, the material used for first patterned layer 232 may match or substantially match the optical and mass properties, for example, of the material used for imaging layer 240 so as avoid or minimize any reflection of radiation in patterning imaging layer 240.

Imaging layer 240 may then be developed in a suitable developer to form a second patterned layer that includes features 251 and 253. As illustrated in FIG. 5, that portion of imaging layer 240 exposed to radiation through the second mask is soluble in the developer and is thus dissolved from imaging layer 240. That portion of imaging layer 240 that has not been exposed to radiation is relatively insoluble in the developer, and thus remains to form features 251 and 253 for the second patterned layer. As first patterned layer 232 has been stabilized, first patterned layer 232 is relatively insoluble in developer and thus undergoes relatively minimal, if any, dissolution for the development of imaging layer 240.

For other embodiments where a suitable negative-tone imaging material is used for imaging layer 240, the negative-tone imaging layer 240 may be exposed to any suitable form of radiation through a suitable negative-tone mask having

5,652,084

7                                          8

opaque features **241**, **243**, and **245** and clear features **242** and **244**, for example. Negative-tone imaging materials may include a suitable negative photoresist, a suitable positive photoresist that is to be subjected to an image reversal process, or a suitable negative-tone radiation-sensitive poly- imide for example. The negative-tone imaging layer **240** may be developed in a suitable developer to form features **251** and **253** for the second patterned layer as illustrated in FIG. **5**. That portion of imaging layer **240** exposed to radiation through the second mask is relatively insoluble in the developer and thus remains to form features **251** and **253**. That portion of imaging layer **240** that has not been exposed to radiation is soluble in the developer and is thus dissolved from imaging layer **240**.

For one embodiment for the method of FIG. **1**, a suitable positive photoresist may be used for both imaging layers **220** and **240** while a suitable deep ultraviolet (DUV) stabiliza- tion technique may be used to stabilize the positive photo- resist for first patterned layer **232**. For another embodiment, a suitable negative photoresist may be used for both imaging layers **220** and **240**.

For a further embodiment for the method of FIG. **1**, imaging layer **220** may include a suitable positive photore- sist and may be exposed through a suitable negative-tone mask. Imaging layer **220** may then be subjected to a suitable image reversal process to form first patterned layer **232**. The image reversal process preferably serves to stabilize first patterned layer **232**. The photoresist of first patterned layer **232**, however, may be subjected to a suitable stabilization technique such as a suitable DUV stabilization technique for example, as necessary to withstand dissolution by solvents during a subsequent spin-on of photoresist. Imaging layer **240** for this embodiment may include any suitable material and may be patterned using any suitable lithographic pat- terning technique to form the second patterned layer.

As a result of the method of FIG. **1**, a single patterned layer is formed over layer **210** as illustrated in FIG. **5**. This single patterned layer is formed from the patterning of imaging layer **220** and the subsequent patterning of imaging layer **240**.

FIG. **6** illustrates, in flow diagram form, another lithog- raphy method for semiconductor fabrication. For one embodiment, the method of FIG. **6** may be used for semi- conductor fabrication using a semiconductor wafer, such as the semiconductor wafer illustrated in FIGS. **7, 8, 9, 10**, and **11** for example.

For the method of a FIG. **6**, a semiconductor substrate **400** is provided as illustrated in FIG. **7**. Substrate **400** may include any suitable semiconductor material, including sili- con (Si) for example.

As illustrated in FIG. **7**, a layer **410** may be formed over substrate **400**. Layer **410** may include any suitable material and may be formed to any suitable thickness using any suitable technique depending, for example, on the purpose of layer **410** in fabricating a desired semiconductor device. The above discussion pertaining to layer **210** for the method of FIG. **1** also pertains to layer **410** for the method of FIG. **6**.

For step **300** of FIG. **6**, an imaging layer is formed over the semiconductor wafer. As illustrated in FIG. **7**, an imag- ing layer **420** is formed over layer **410**. Imaging layer **420** may include any suitable material formed to any suitable thickness using any suitable technique.

For one embodiment, imaging layer **420** may include a suitable positive photoresist, for example, that has been spun-on to a thickness of approximately 10,000 Å. Other

suitable thicknesses of positive photoresist, for example in the range of approximately 1,000 Å to approximately 30,000 Å, may also be used. For other embodiments, imaging layer **420** may include other suitable radiation-sensitive materials.

For step **310** of FIG. **6**, the imaging layer is exposed to radiation in accordance with a first pattern. Imaging layer **420** may be exposed in accordance with any suitable pattern using any suitable form of radiation.

Imaging layer **420** may be exposed to radiation through a first mask having opaque features **421** and **423** and clear feature **422** as illustrated in FIG. **7**. The first mask may include any suitable pattern of opaque and clear features that may depend, for example, on the desired pattern to be formed in imaging layer **420**. Where a suitable positive photoresist is used for imaging layer **420** and is to be subjected to an image reversal process, the first mask may be a suitable negative- tone mask to form the desired pattern in imaging layer **420**.

For step **320** of FIG. **6**, that portion of the imaging layer exposed to radiation is stabilized. Any suitable stabilization technique may be used and may depend, for example, on the material used to form imaging layer **420**. As illustrated in FIG. **8**, an exposed portion **432** of imaging layer **420** has been stabilized.

Exposed portion **432** of imaging layer **420** may be stabi- lized to withstand subsequent lithographic processing steps. Exposed portion **432** may be stabilized to withstand chemi- cal transformation as a result of any subsequent exposure to radiation, for example. Exposed portion **432** may also be stabilized to withstand dissolution by a subsequent developer, for example.

Where a suitable positive photoresist is used to form imaging layer **420**, a suitable image reversal process may be used to stabilize exposed portion **432** of imaging layer **420**. For one embodiment, imaging layer **420** may be, after the exposure to radiation through the first mask, subjected to an ammonia ($NH_3$) ambient and heated to a temperature of approximately 95 degrees Celsius, for example, in an approximately 600 torr environment, for example, for approximately 45 minutes, for example. Other suitable temperatures, pressures, and periods of time may also be used. Temperatures may range from approximately 80 degrees Celsius to approximately 110 degrees Celsius, for example. Pressures may range from approximately 500 torr to approximately 760 torr, for example. Time periods may range from approximately 30 minutes to approximately 60 minutes, for example.

For other embodiments, a suitable positive photoresist may be used for imaging layer **420** such that heating imaging layer **420** invokes the image reversal process to stabilize exposed portion **432**.

Stabilizing positive photoresist in exposed portion **432** serves to neutralize photoactive compounds in exposed portion **432**. Upon any exposure to radiation then, exposed portion **432** undergoes minimal, if any, chemical transfor- mation. Exposed portion **432** may also be subjected to a subsequent development with relatively minimal, if any, dissolution by a developer.

For step **330** of FIG. **6**, the imaging layer is exposed to radiation in accordance with a second pattern. Imaging layer **420** may be exposed in accordance with any suitable pattern using any suitable form of radiation.

Imaging layer **420** may be exposed to radiation through a second mask having opaque features **441**, **443**, and **445** and clear features **442** and **444** as illustrated in FIG. **9**. The second mask may include any suitable pattern of opaque and clear features that may depend, for example, on the desired

9

pattern to be formed in imaging layer **420**. Where a positive photoresist is used for imaging layer **420** and is to be subjected to an image reversal process, the second mask may be a suitable negative-tone mask to form the desired pattern in imaging layer **420**.

For step **340** of FIG. **6**, that portion of the imaging layer exposed to radiation for step **330** is stabilized. Any suitable stabilization technique may be used and may depend, for example, on the material used to form imaging layer **420**. As illustrated in FIG. **8**, an exposed portion **431** and **433** of imaging layer **420** has been stabilized.

Exposed portion **431** and **433** of imaging layer **420** may be stabilized to withstand subsequent lithographic processing steps. Exposed portion **431** and **433** may be stabilized to withstand chemical transformation as a result of any subsequent exposure to radiation, for example. Exposed portion **431** and **433** may also be stabilized to withstand dissolution by a subsequent developer, for example.

Where a suitable positive photoresist is used to form imaging layer **420**, a suitable image reversal process may be used to stabilize exposed portion **431** and **433** of imaging layer **420**. For one embodiment, imaging layer **420** may be subjected to an image reversal process similar to the image reversal process used to stabilize exposed portion **432**. The above discussion regarding the image reversal process for exposed portion **432** similarly applies for stabilizing exposed portion **431** and **433**.

Stabilizing the positive photoresist in exposed portion **431** and **433** serves to neutralize photoactive compounds in exposed portion **431** and **433**. Upon any exposure to radiation then, exposed portion **431** and **433** undergoes minimal, if any, chemical transformation. Exposed portion **431** and **433** may also be subjected to a subsequent development with relatively minimal, if any, dissolution by a developer.

Where positive photoresist has been subjected to an image reversal process to render exposed portions **431**, **432**, and **433** relatively insoluble, imaging layer **420** may be subjected to a flood exposure of radiation to render the remaining portion of imaging layer **420** soluble for development. This remaining portion of imaging layer **420** has not been previously exposed to radiation through the first or second masks. Imaging layer **420** may be flood exposed using any suitable form of radiation. For one embodiment, the positive photoresist of imaging layer **420** may be subjected to approximately 600 millijoules of a collimated light beam approximately 365 nanometers in wavelength for this flood exposure. As portions **431**, **432**, and **433** of imaging layer **420** have been stabilized, portions **431**, **432**, and **433** undergo minimal, if any, chemical transformation as a result of any exposure to radiation for patterning imaging layer **420**.

For step **350** of FIG. **6**, the imaging layer is developed to form a patterned layer. Imaging layer **420** may be developed in any suitable developer to form a patterned layer that includes portions **431**, **432**, and **433** as illustrated in FIG. **11**. As portions **431**, **432**, and **433** of imaging layer **420** have been stabilized, portions **431**, **432**, and **433** are relatively insoluble in developer and thus undergo relatively minimal, if any, dissolution. Portions **431**, **432**, and **433** thus remain to form features **431**, **432**, and **433** for the patterned layer after development. The remaining portion of imaging layer **420** is dissolved from imaging layer **420** in the developer.

As a result of the method of FIG. **6**, a single patterned layer is formed over layer **410** as illustrated in FIG. **11**.

For another embodiment for the method of FIG. **6**, a suitable negative-tone radiation-sensitive polyimide may be

10

used to form imaging layer **420** for step **300** of FIG. **6**. For step **310** of FIG. **6**, imaging layer **420** may be exposed to radiation through a first suitable negative-tone mask as illustrated in FIG. **7**. The exposure of the polyimide to radiation for step **310** of FIG. **6** serves to stabilize exposed portion **432** for step **320** of FIG. **6**, as illustrated in FIG. **8**. Upon any subsequent exposure to radiation, exposed portion **432** undergoes minimal, if any, chemical transformation. Exposed portion **432** may also be subjected to a subsequent development with relatively minimal, if any, dissolution by a developer.

For step **330** of FIG. **6**, imaging layer **420** may be exposed to radiation through a second suitable negative-tone mask, as illustrated in FIG. **9**. The exposure of the polyimide to radiation for step **330** of FIG. **6** serves to stabilize exposed portion **431** and **433** for step **340** of FIG. **6**, as illustrated in FIG. **10**. Exposed portion **431** and **433** may be subjected to a subsequent development with relatively minimal, if any, dissolution by a developer.

For step **350** of FIG. **6**, the polyimide of imaging layer **420** may be developed in any suitable developer to form a patterned layer that includes portions **431**, **432**, and **433** as illustrated in FIG. **11**. The resulting single patterned layer may then be finally cured using a suitable heat treatment.

FIG. **12** illustrates, in flow diagram form, another lithography method for semiconductor fabrication. For one embodiment, the method of FIG. **12** may be used for semiconductor fabrication using a semiconductor wafer, such as the semiconductor wafer illustrated in FIGS. **13**, **14**, **15**, and **16** for example.

For the method of a FIG. **12**, a semiconductor substrate **600** is provided as illustrated in FIG. **13**. Substrate **600** may include any suitable semiconductor material, including silicon (Si) for example.

As illustrated in FIG. **13**, a layer **610** may be formed over substrate **600**. Layer **610** may include any suitable material and may be formed to any suitable thickness using any suitable technique depending, for example, on the purpose of layer **610** in fabricating a desired semiconductor device. The above discussion pertaining to layer **210** for the method of FIG. **1** also pertains to layer **610** for the method of FIG. **12**.

For step **500** of FIG. **12**, an imaging layer is formed over the semiconductor wafer. As illustrated in FIG. **13**, an imaging layer **620** is formed over layer **610**. Imaging layer **620** may include any suitable material formed to any suitable thickness using any suitable technique.

For one embodiment, imaging layer **620** may include a suitable positive photoresist, for example, that has been spun-on to a thickness of approximately 10,000 Å. Other suitable thicknesses of positive photoresist, for example in the range of approximately 1,000 Å to approximately 30,000 Å, may also be used.

For step **510** of FIG. **12**, the imaging layer is exposed to radiation in accordance with a first pattern. Imaging layer **620** may be exposed in accordance with any suitable pattern using any suitable form of radiation.

Where a positive photoresist is used for imaging layer **620**, imaging layer **620** may be exposed to radiation through a first mask having opaque features **621** and **623** and clear feature **622** as illustrated in FIG. **13**. The first mask may include any suitable pattern of opaque and clear features that may depend, for example, on the desired pattern to be formed in imaging layer **620**. Where a positive photoresist is used for imaging layer **620** and is to be subjected to an image reversal process, the first mask may be a suitable negative-tone mask to form the desired pattern in imaging layer **620**.

5,652,084

11

For step 520 of FIG. 12, that portion of the imaging layer exposed to radiation is stabilized. Any suitable stabilization technique may be used and may depend, for example, on the material used to form imaging layer 620. As illustrated in FIG. 14, an exposed portion 632 of imaging layer 620 has been stabilized.

Exposed portion 632 of imaging layer 620 may be stabilized to withstand subsequent lithographic processing steps. Exposed portion 632 may be stabilized to withstand chemical transformation as a result of any subsequent exposure to radiation, for example. Exposed portion 632 may also be stabilized to withstand dissolution by a subsequent developer, for example.

Where a suitable positive photoresist is used to form imaging layer 620, a suitable image reversal process may be used to stabilize exposed portion 632 of imaging layer 620. For one embodiment, imaging layer 620 may be, after the exposure to radiation through the first mask, subjected to an ammonia (NH₃) ambient and heated to a temperature of approximately 95 degrees Celsius, for example, in an approximately 600 torr environment, for example, for approximately 45 minutes, for example. Other suitable temperatures, pressures, and periods of time may also be used. Temperatures may range from approximately 80 degrees Celsius to approximately 110 degrees Celsius, for example. Pressures may range from approximately 500 torr to approximately 760 torr, for example. Time periods may range from approximately 30 minutes to approximately 60 minutes, for example.

For other embodiments, a suitable positive photoresist may be used for imaging layer 620 such that heating imaging layer 620 invokes the image reversal process to stabilize exposed portion 632.

Stabilizing positive photoresist in exposed portion 632 serves to neutralize photoactive compounds in exposed portion 632. Upon any exposure to radiation then, exposed portion 632 undergoes minimal, if any, chemical transformation. Exposed portion 632 may also be subjected to a subsequent development with relatively minimal, if any, dissolution by a developer.

For step 530 of FIG. 12, the imaging layer is exposed to radiation in accordance with a second pattern. Imaging layer 620 may be exposed in accordance with any suitable pattern using any suitable form of radiation.

Where a positive photoresist is used for imaging layer 620, imaging layer 620 may be exposed to radiation through a second mask having opaque features 642 and 644 and clear features 641,643, and 645 as illustrated in FIG. 15. The second mask may include any suitable pattern of opaque and clear features that may depend, for example, on the desired pattern to be formed in imaging layer 620.

Imaging layer 620 may be exposed through the second mask using any suitable form of radiation. The radiation serves to render soluble in a suitable developer that portion of imaging layer 620 exposed to radiation through clear features 641, 643, and 645. As portion 632 of imaging layer 620 has been stabilized, portion 632 undergoes minimal, if any, chemical transformation as a result of any exposure to radiation for patterning imaging layer 620. Portion 632 thus remains relatively insoluble despite any exposure to radiation. That portion of imaging layer 620 that has not been exposed to radiation remains relatively insoluble in the developer.

Preferably, portion 632 of imaging layer 620 does not affect in a material manner the subsequent lithographic patterning of imaging layer 620. That is, portion 632 pref-

12

erably does not materially affect the desired subsequent patterning of imaging layer 620, for example, by reflecting any radiation.

For step 540 of FIG. 12, the imaging layer is developed to form a patterned layer. Imaging layer 620 may be developed in any suitable developer to form a patterned layer that includes features 631, 632, and 633 as illustrated in FIG. 16. That portion of imaging layer 620 exposed to radiation through the second mask is soluble in the developer and is thus dissolved from imaging layer 620. As portion 632 of imaging layer 620 has been stabilized, portion 632 is relatively insoluble in developer and thus undergoes relatively minimal, if any, dissolution for the development of imaging layer 620. That portion of imaging layer 620 that has not been exposed to radiation is also relatively insoluble in the developer, and thus remains in to form features 631 and 633 for the patterned layer.

As a result of the method of FIG. 12, a single patterned layer is formed over layer 610 as illustrated in FIG. 16.

Although the methods of FIGS. 1, 6, and 12 are illustrated as using masks for the selective exposure of imaging layers to radiation, other suitable lithographic techniques may also be used for the methods of FIGS. 1, 6, and 12 to expose imaging layers to radiation in accordance with suitable patterns. As one example, a suitable direct-write exposure technique may be used to expose an imaging layer to radiation in accordance with a suitable pattern.

For the methods of FIGS. 1, 6, and 12, features for the resulting single patterned layer, such as the patterned layer illustrated in FIGS. 5, 11, and 16 respectively, may be formed relatively closer to one another as the resolution of the lens for the lithographic patterning of an imaging layer through a single exposure to radiation does not limit the pitch for adjacent features of the single patterned layer. As these features may be formed relatively closer to one another, the density with which semiconductor devices may be fabricated may be increased, allowing semiconductor devices to be fabricated with relatively smaller sizes.

The lithography methods of FIG. 1, 6, and 12 may be used, for example, in fabricating various semiconductor devices, including digital components such as microprocessors, memories such as random access memories (RAMs), controllers, etc.

The lithography methods of FIGS. 1, 6, and 12 may be used, for example, to form a single patterned layer that serves as a mask in patterning an underlying layer, such as layers 210, 410, and 610 respectively. The underlying layer may be patterned using a suitable etch technique and chemistry. As the pattern in the mask layer, such as the single patterned layer illustrated in FIGS. 5, 11, and 16, becomes replicated in the underlying layer, features for the underlying layer may be formed relatively closer to one another.

As another example, the lithography methods of FIGS. 1, 6, and 12 may be used to form disposable posts as discussed in U.S. application Ser. No. 08/179,615, filed Jan. 10, 1994, entitled DISPOSABLE POST PROCESSING FOR SEMICONDUCTOR DEVICE FABRICATION, by James M. Cleeves, and assigned to the same assignee as the present application. As disposable posts are removed to form openings for a subsequent layer, such as a contact, via, or interconnect layer for example, such openings may be formed relatively closer to one another.

In the foregoing description, the invention has been described with reference to specific exemplary embodiments thereof. It will, however, be evident that various modifications and changes may be made thereto without departing

13

from the broader spirit or scope of the present invention as defined in the appended claims. The specification and drawings are, accordingly, to be regarded in an illustrative rather than a restrictive sense.

What is claimed is:

1. A lithography method for semiconductor fabrication using a semiconductor wafer, comprising the steps of:

(a) forming a first imaging layer over the semiconductor wafer;

(b) patterning the first imaging layer in accordance with a first pattern to form a first patterned layer having a first feature;

(c) stabilizing the first patterned layer;

(d) forming a second imaging layer over the first pattern layer; and

(e) patterning the second imaging layer in accordance with a second pattern to form a second patterned layer having a second feature distinct from the first feature, wherein the second patterned layer and the first patterned layer form a single patterned layer, and wherein the first and second features which are formed relatively closer to one another than is possible through a single exposure to radiation.

2. The method of claim 1, wherein the first imaging layer includes a positive photoresist.

3. The method of claim 1, wherein the second imaging layer includes a positive photoresist.

4. The method of claim 1, wherein the patterning step (b) includes the steps of:

(i) exposing a portion of the first imaging layer to radiation; and

(ii) developing the first imaging layer such that the exposed portion dissolves to form the first patterned layer.

5. The method of claim 1, wherein the patterning step (e) includes the steps of:

(i) exposing a portion of the second imaging layer to radiation; and

(ii) developing the second imaging layer such that the exposed portion dissolves to form the second patterned layer.

6. The method of claim 1, wherein the patterning step (b) includes the step of exposing a portion of the first imaging layer to radiation through a mask.

7. The method of claim 1, wherein the patterning step (e) includes the step of exposing a portion of the second imaging layer to radiation through a mask.

8. The method of claim 1, wherein the stabilizing step (c) includes the step of using a PRIST technique to stabilize the first patterned layer.

9. The method of claim 1, wherein the stabilizing step (c) includes the step of using a silylation technique to stabilize the first patterned layer.

14

10. The method of claim 1, wherein the stabilizing step (c) includes:

exposing the first patterned layer to radiation and

heating the first patterned layer.

11. The method of claim 1, wherein the stabilizing step (c) includes exposing the first patterned layer to radiation having a wavelength in a range from approximately 200 nanometers to approximately 400 nanometers, and

heating the first patterned layer at a temperature ramped to approximately 230 degrees Celsius.

12. The lithography method of claim 1, where the first and second features do not overlap.

13. A lithography method for semiconductor fabrication using a semiconductor wafer, comprising the steps of:

(a) forming a first imaging layer over the semiconductor wafer;

(b) patterning the first imaging layer in accordance with a first pattern to form a first patterned layer having a first disposable post;

(c) stabilizing the first patterned layer;

(d) forming a second imaging layer over the first patterned layer; and

(e) patterning the second imaging layer in accordance with a second pattern to form a second patterned layer having a second disposable post, wherein the second patterned layer and the first patterned layer together form a single patterned layer, wherein the first and second disposable posts are formed relatively closer to one another than is possible through a single exposure to radiation.

14. The lithography method of claim 13, where the first and second features do not overlap.

15. A lithography method for semiconductor fabrication using a semiconductor wafer, comprising the steps of:

(a) forming a first imaging layer over the semiconductor wafer;

(b) patterning the first imaging layer in accordance with a first pattern to form a first patterned layer having a first feature;

(c) stabilizing the first patterned layer;

(d) forming a second imaging layer over the first patterned layer; and

(e) patterning the second imaging layer in accordance with a second pattern to form a second patterned layer having a second feature, wherein the second patterned layer and the first patterned layer form a single patterned layer, the first and second features having a pitch which is not limited by a single exposure to radiation.

16. The lithography method of claim 15, where the first and second features do not overlap.

* * * * *

# United States Court of Appeals
## for the Federal Circuit

*DSS Technology Management Inc. v. Taiwan Semiconductor*, 15-1684

## CERTIFICATE OF SERVICE

I, Christian Hurt, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On **July 28, 2015** I electronically filed the foregoing **Brief for Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

David H. Harper, *Principal Attorney*
Debra J. McComas
Stephanie Sivinski
Haynes & Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
214-651-5000
david.harper@haynesboone.com
debbie.mccomas@haynesboone.com
stephanie.sivinski@haynesboone.com
*Counsel for Appellees,*
*Taiwan Semiconductor*
*Manufacturing Company, Ltd., et al.*

Jared Bobrow, *Principal Attorney*
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
650-802-3000
jared.bobrow@Weil.com
*Counsel for Appellees,*
*Samsung Electronics Co., Ltd., et al.*

Karen S. Precella
Haynes and Boone, LLP
301 Commerce Street, Suite 2600
Fort Worth, TX 76102
817-347-6620
karen.precella@haynesboone.com
*Counsel for Appellees,*
*Taiwan Semiconductor*
*Manufacturing Company, Ltd., et al.*

Allen Franklin Gardner
Michael E. Jones
Potter Minton, PC
110 N. College Avenue, Suite 500
Tyler, TX 75702
903-597-8311
allengardner@potterminton.com
mikejones@potterminton.com
*Counsel for Appellees,*
*Samsung Electronics Co., Ltd., et al.*

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, I will cause six paper copies to be filed with the Court within the time provided in the Court's rules.

Date: July 28, 2015

Christian Hurt
*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1.       This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because it contains 5,660 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.       This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2011 for Mac in Times New Roman 14 point font.

Date: July 28, 2015

_____
Christian Hurt
*Attorney for Plaintiff-Appellant*